**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

**APPEAL NO. 18-1953**

---

**KERRON ANDREWS,**

*Appellant,*

**v.**

**BALTIMORE CITY POLICE DEPARTMENT, *ET AL.*,**

*Appellees.*

---

Appeal from the United States District Court
For the District of Maryland
(Honorable Stephanie A. Gallagher, District Judge)

---

**CORRECTED SEALED SUPPLEMENTAL BRIEF OF APPELLANT**

---

Michael A. Pichini                Goodell, DeVries, Leech & Dann
Michael C. Heyse                  One South Street, 20th Floor
George S. Mahaffey                Baltimore, MD 21202
                                  410-783-4000
                                  map@gdldlaw.com
                                  mheyse@gdldlaw.com
                                  gsm@gdldlaw.com

                                  *Attorneys for Appellant,*
                                  *Kerron Andrews*

**TABLE OF CONTENTS**

INTRODUCTION AND JURISDICTIONAL STATEMENT……………………….1

STATEMENT OF ISSUE PRESENTED FOR REVIEW……………………….…3

UPDATED STATEMENT OF THE CASE……………………………………….3

SUMMARY OF THE ARGUMENT……………………………………………..14

APPLICABLE STANDARD OF REVIEW……………………………………15

ARGUMENT…………………………………………………………………...16

I.     The district court failed to read the facts in the light most favorable to Andrews……………………………...…………….…...16

II.     The district court abused its discretion refusing to compel production of the hailstorm operator's manual…………………......19

III.     The pro did not satisfy the fourth amendment's warrant requirement……………………………………….......... 28

     A. The district court correctly concluded the officers conduct a search requiring a warrant, albeit while making clearly erroneous factual findings........................................ 28

     B. The PRO issued here does not satisfy the warrant requirement of the Fourth Amendment……………………….……30

         i.     Maryland's Pen Register and Trap and Trace Statute Does Not Authorize Using Hailstorm or Comparable Devices………………...………………30

         ii.     Using "*probable cause*" does not concert the PRO into a warrant…………………..……………..34

         iii.     The PRO did not describe with particularity the apartment located at 5032 Clifton Ave as the place to be searched………………………………..…...40

iv.    BPD did not treat the PRO like a warrant until its conduct was challenged by Andrews……………...…..45

IV.    The district court erroneously concluded that the officers are entitled to qualified immunity and public official immunity………..…49

    A. Qualified Immunity……………………………..………...…49

        1. Conducting the qualified immunity analysis……….…..51

        2. The District Court Erroneously Concluded that the Officers Did Not Violate Clearly Established Law……….…….52

    B. Public Official Immunity……………………………………...54

    C. BPD Cannot Avoid Monell Liability……………………….…55

CONCLUSION……………………………………………………….. 57

APPLICABLE FEDERAL AND STATE STATUTES, RULES, AND REGULATIONS…..………………………………….….. a

    Federal Statutes & Constitutional Amendment………………..………....a

        U.S. CONST. Amend. IV………………….….…………….a

        18 U.S.C. § 2510………………………………………..…...a

        18 U.S.C. § 3127…………………………………………..f

        42 U.S.C. § 1983………………………………..……….......g

        Communications Assistance for Law Enforcement Act ("CALEA") 47 U.S.C. § 1002 – Assistance capability requirements………...……h

    Maryland Rules and Statutes………………………………..……….k

        MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-01(c)(1)-(2); (d)(1)-(2) (2014)…………………………………………k

ii

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-03 (2014)……..….k

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04 (c)(1); (d) (2014)….………………………………………………..….I

MD. RULE ANN. 4-601 (c); (d); (g)……………………………....I

MD. CODE ANN., CRIMINAL PROCEDURE § 1-203.1(b)(1)-(2); (d)(1)-(3) (effective Oct. 1, 2014)……………………………..…..m

REQUEST FOR ORAL ARGUMENT………………………………………...

CERTIFICATE OF COMPLIANCE……………………………………….…

CERTIFICATE OF SERVICE………………………………………………….

# TABLE OF AUTHORITIES

**Cases**                                                                    PAGE

*Anderson v. City of Bessemer City, North Carolina*,
470 U.S. 564 (1985)…………………………………..……... 16, 50

*Anderson v. Creighton*,
483 U.S. 635 (1987)………………………………………………... 52

*Andrews v. BPD*,
8 F.4th 234 (4th Cir. 2020)…………………………………….. 2, *passim*

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)…………………………………….…..52

*Baltimore Sun Co., v. Goetz*,
886 F.2d 60 (4th Cir. 1989)…………………………………….…...... 46

*Barbre v. Pope*,
935 A.2d 699 (Md. 2007)…………………………………….….......... 55

*Booker v. S.C. Dep't of Corr.*,
855 F.3d 533 (4th Cir. 2017)………………………………….……… 52

*Boyd v. United States*,
116 U.S. 616 (1886)…………………………………………………... 44

*Brooks v. Johnson*,
924 F.3d 104 (4th Cir. 2019)………………………………….……… 15, 19

*Carroll v. Carman*,
135 S.Ct. 348 (2014)……………………………………….………… 52

*Carpenter v. United States*,
138 S. Ct. (2018)………………………………………….. 28, 38, 39, 40

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………….…..……… 15

iv

*Chan v. State*,
552 A.2d 1351 (Md. App. 1989)……………………..…………….…………. 31

*Cooper v. Rodriguez*,
118 A.3d 829 (Md. 2015)……………………………….…...……………… 55

*Dalia v. United States*,
441 U.S. 238 (1979)………………………………………...……............ 43, 44

*Durham v. Horner*,
690 F.3d 183 (4th Cir. 2012)…………………………………….………… 49

*Franks v. Delaware*,
438 U.S. 154 (1978)……………………………………...……… 53

*Gen. Ins. Co. of Am. v. United States Fire Ins. Co.*,
886 F.3d 346 (4th Cir. 2018)…………………………………….……... 15, 17

*Graham v. Conner*,
490 U.S. 386 (1989)……………………………………...………… 50

*Groh v. Ramirez*,
540 U.S. 551 (2004)………………………………………...……….. 40

*Henry v. Purnell*,
652 F.3d 524 (4th Cir. 2011)………………………………...………... 49

*Houghton v. Forrest*,
989 A.2d 223 (Md. 2010)………………………………...……………… 55

*Hope v. Pelzer*,
536 U.S. 730 (2002)……………………………………...……... 50, 51

*Illinois v. Gates*,
462 U.S. 213 (1983)……………………………………...……….. 34, 40

*Iko v. Shreve*,
535 F.3d 225 (4th Cir. 2008)………………………….……………… 49

*In re United States for an Order Directing Provider of Elec. Commun. Serv. to Disclose Records to the Gov't,*
620 F.3d 304 (3d Cir. 2010)……,,,,…………………………………………………... 32

*In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth.,*
396 F. Supp. 2d 747 (S.D. Tex. 2005) …………………………………………... 34

*Kyllo v. United States,*
533 U.S. 27 (2001)………………………………………………………… 28, 39, 54

*Malley v. Briggs,*
475 U.S. 335 (1986)………………………………………………...…………… 51

*Maryland v. Garrison,*
480 U.S. 79 (1987)……………………………………………………...………41, 42

*Matter of Leopold to Unseal Certain Electronic Surveillance Applications and Orders,* 300 F.Supp.3d 61 (D.D.C. 2018)…………………………………... 46

*Melgar ex rel. Melgar v. Greene,*
593 F.3d 348 (4th Cir. 2010)…………………………………………………… 52

*Miller v. Prince George's County,*
475 F.3d 621 (4th Cir. 2007)………………………………………………….. 53

*Meyers v. Balt. Cty., Md.,*
713 F.3d 723 (4th Cir. 2013)……………………………………...………... 15

*Monell v. Dep't of Soc. Svcs.,*
436 U.S. 658 (1978)…………………………………………………………... 55

*Mullenix v. Luna,*
136 S.Ct. 305 (2015) ………………………………………………………….. 50

*Owens ex rel. Ovens v. Lott,*
372 F.3d 267 (4th Cir. 2004)…………………………………………………..52

*PBM Prods., LLC v. Mead Johnson & Co.,*
639 F.3d 111 (4th Cir. 2011)…………………………………….…………… 16

*Pearson v. Callahan*,
555 U.S. 223 (2009)…………………………………………..………… 50,52

*Pritchett v. Alford*,
973 F.2 307 (4th Cir. 1992)…………………………….………... 51

*Putman v. Harris*,
66 F.4th 181 (4th Cir. 2023)……………………………………... 49

*Riley v. California*,
134 S. ct.  2473 (2014)………………………………….………. 40

*Saucier v. Katz*,
533 U.S. 194, 200 (2001)……………………………….……… 50

*Silverman v. United States*,
365 U.S. 505 (1961)……………………………...…………….. 29, 33

*Smith v. Maryland*,
442 U.S. 735 (1979)………………………………………….. 32

*State v. Andrews*,
134 A.3d 324 (Md. App. 2016)………………………………... 1, *passim*

*Tolan v. Cotton*,
134 S. Ct. 1861 (2014)…………………………………...………. 50

*United States v. Briscoe*,
101 F.4th 282 (4th Cir. 2024)……………………………………. 34

*United States v. Chatrie*,
136 F.4th 100 (4th Cir. 2025)…………………………….…… 38, 39

*United States v. Delfino*,
510 F.3d 468 (4th Cir. 2007)…………………………………… 16, 20

*United States v. El Shafee Elsheikh*,
103 F.4th 1006 (4th Cir. 2024)………………………….………... 16

*United States v. Ferebee*,
957 F.3d 406 (4th Cir. 2020)………………………………...………….... 16

*United States v. Higgins*,
428 F.2d 232 (7th Cir. 1970)……………………………………………..41

*United States v. Jones*,
565 U.S. 400 (2012)……………………………..……………... 38, 39

*United States v. Lanier*,
520 U.S. 259 (1997)…………………………..………………... 50, 51

*United States v. Leon*,
468 U.S. 897 (1984)………………………………………………... 40

*United States v. Newman*,
733 F.2d 1395 (10th Cir. 1984)……………………........….……….. 32

*United States v. Patrick*,
842 F.3d 540 (7th Cir. 2016) …………………..….…………… 20, 21, 44, 48

*United States v. Smith*,
110 F.4th 817 (5th Cir. 2024)……………………….………… 38

*United States v. Votteller*,
544 F.2d 1355 (6th Cir. 1976)…………………………………... 41

*Wall v. Wade*,
741 F.3d 492 (4th Cir. 2014)…………………….…………… 51

*Wileman v. Frank*,
979 F.3d 30 (4th Cir. 1992)……………………..…………….. 16

*Wilson v. Arkansas*,
514 U.S. 927 (1995)…………………………………..…….…47

*Wilson v. Layne*,
526 U.S. 603 (1999)…………………………...…………… 50

viii

*Wilson v. Prince George's Cty., Md*,
893 F.3d 213 (4th Cir. 2018)…………………………………………………… 15, 17

*Winfield v. Bass*,
106 F.3d 525 (4th Cir. 1997)……………………………………...…………… 50

*Witt v. W. Va. State Police, Troop 2*,
633 F.3d 272 (4th Cir. 2011)………………………………………………… 49

*Wong Sun v. United* States,
371 U.S. 471 (1963)…………………………………………………...…..…... 29

*Yanez-Marquez v. Lynch*,
789 F.3d 434 (4th Cir. 2015)…………………………………...……… 41

## FEDERAL STATUTES

18 U.S.C. § 2510 …………………………………………………………... 31

18 U.S.C. § 3127 …………………………………………………………... 31

28 U.S.C. § 1331……………………………………………………..…… 2

28 U.S.C. § 1441(a)………………………………………………..……… 2

42 U.S.C. § 1983…………………………………………………...…….. 2, 56

47 U.S.C. § 1002………………………………………………….……33

## MARYLAND STATUTES AND RULES

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-03 …………………………... 32

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04 ………………………….... 46

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04(a)(1)………………………… 31

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-01(c)(1)………………………… 31

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-01(c)(2)………………………… 32

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04(d)………………..……...46, 47

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-01(d)(1)………………………... 31

MD. CODE ANN., CRIM. PROC. § 1-203.1………………...…..………... 34, 35, 47

ix

MD. CODE ANN., CRIM. PROC. § 1-203(b)(1)…………………………..……34

MD. CODE ANN. CRIM. PRO. § 1-203.1(b)(1)-(2)………………………...…..47

MD. CODE ANN. CRIM. PRO. § 1-203.1(d)(1)–(3)……………………..……48

MD. RULE ANN. 4-601(c) …………………………………………………... 47

MD. RULE ANN. 4-601(d) . ………………………………………………..31

MD. RULE ANN. 4-601(g) ………………………………………………... 47

2014 Md. Laws ch. 191 ……………………………………………………… 47

Secondary Sources

Brian L. Owsley, *Triggerfish, Stingrays, and Fourth Amendment Fishing Expeditions*, 66 Hastings L.J. 183, 193–94 (2014)…………………………... 37, 48

*Justice News, Justice Department Announces Enhanced Policy for Use of Cell-Site Simulators*, DOJ 15-1084 (2015) …………………………………… 34

Susan Freiwald, *The Carpenter Chronicle: A Near-Perfect Surveillance*, 132 Harv. L. Rev. 205, 205 (2018)……………………………………….……48

Stephanie K. Pell & Christopher Soghoian, *Your Secret Stingray's No Secret Anymore: The Vanishing Government Monopoly over Cell Phone Surveillance and Its Impact on National Security and Consumer Privacy*, 28 Harv. J.L. & Tech. 1, 11-12 (2014)……………....……4, 21

Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 4.5(b), at 731 (5th ed. 2012)……………………………………….……41

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

**APPEAL NO. 18-1953**

---

**KERRON ANDREWS,**

*Appellant,*

**v.**

**BALTIMORE CITY POLICE DEPARTMENT, *ET AL*.,**

*Appellees.*

---

Appeal from the United States District Court
For the District of Maryland
(Honorable Stephanie A. Gallagher, District Judge)

---

**SUPPLEMENTAL BRIEF OF APPELLANT**

---

**INTRODUCTION AND JURISDICTIONAL STATEMENT**

Two Baltimore City Police Department ("BPD") officers conducted a

warrantless and unconstitutional search, using a "Hailstorm" cell-site simulator

("CSS"), to locate Appellant Kerron Andrews ("Andrews").  Andrews spent

approximately 700 days in pretrial detention incident to BPD's unconstitutional

Hailstorm use.  He successfully moved to suppress the Hailstorm search as a

Fourth Amendment violation.  *State v. Andrews*, 134 A.3d 324 (Md. App. 2016).

1

He subsequently filed an action under 42 U.S.C. §1983 against BPD, the two BPD officers, John Haley and Michael Spinnato, and BPD Commissioner Kevin Davis in his official capacity. Joint Appendix ("JA") 12–26.

On June 10, 2016, the case was removed to the United States District Court for the District of Maryland pursuant to 28 U.S.C. §1441(a); the District Court had original jurisdiction over Count I of the Complaint pursuant to 28 U.S.C. §1331. JA 8–10. On August 1, 2018, the District Court entered final judgment in favor of all defendants in the case, granting defendants' respective motions to dismiss, treated at motions for summary judgment, and motion for partial judgment. JA 162-181.

On August 14, 2018, Andrews appealed. JA 182. *See* F.R.A.P. 4(a). The Court subsequently remanded the case to the District Court for further fact finding regarding the Hailstorm's functional capabilities, but retained jurisdiction. *Andrews v. BPD*, 8 F.4th 234 (4th Cir. 2020); Fourth Circuit ECF No. 48.

After additional discovery, the District Court entered an indicative ruling. Supplemental Joint Appendix ("SA") 45-66, 806-27. On April 23, 2025, this Court again remanded the proceedings to the District Court for entry of the court's summary judgment rulings, and retained jurisdiction. ECF No. 61.

2

On May 1, 2025, the District Court granted Summary Judgment.  SA 19-44,

780-805.  On May 6, 2025, the Court ordered supplemental briefing.  Fourth

Circuit ECF No. 62.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred by failing to view the facts in the light most favorable to Andrews.

2. Whether the District Court abused its discretion refusing to compel production of the Hailstorm operator's manual.

3. Whether the District Court erred in holding that the Pen Register Order satisfied the Fourth Amendment's warrant requirement.

4. Whether the District Court erred granting the Officers qualified immunity and public official immunity because they disingenuously failed to disclose their intent to deploy the Hailstorm when seeking the Pen Register Order.

5. Whether the District Court erred by denying *Monell* liability where the BPD's Nondisclosure Agreement with the FBI precluded their disclosure of their intent to deploy the Hailstorm or its functional capabilities.

## UPDATED STATEMENT OF THE CASE

This Court remanded to the District Court on March 27, 2020, for further

fact-finding regarding the Hailstorm's functional capabilities.  *Andrews*, 8 F.4th

234.  The Court found that Appellees conducted a search necessitating a warrant

by using the CSS to locate Andrews.  *Id.* at 236.  The Court remanded because the

record failed to divulge the Hailstorm's "degree of intrusion onto constitutionally

protected areas," what information the device collected, and how many phones

other than Andrews' the Hailstorm identified.  *Id.* at 236-38.  The Court expressed

3

concern regarding not just how the Hailstorm was deployed here, but also about the device's broader capabilities. *Id.* (citing *Stephanie K. Pell & Christopher Soghoian, Your Secret Stingray's No Secret Anymore: The Vanishing Government Monopoly over Cell Phone Surveillance and Its Impact on National Security and Consumer Privacy*, 28 Harv. J.L. & Tech. 1, 11-12 (2014) (noting that Hailstorm-like devices can "'intercept outgoing calls and text messages' by sending 'signals, often indiscriminately, through the walls of homes, vehicles, purses, and pockets.'")). The Court demanded discovery of six Hailstorm functional capabilities:

> 1) The maximum range at which the Hailstorm simulator can force nearby cellular devices to connect to it;
>
> (2) The maximum number of cellular devices from which the Hailstorm simulator can force a connection;
>
> (3) All categories of data the Hailstorm simulator may collect from a cellular device, regardless of whether such data is displayed to the Hailstorm simulator's operator in the course of locating a target phone, including by way of example and without limitation: cellular device identifiers (such as international mobile equipment identity ("IMEI") numbers, international mobile subscriber identity ("IMSI") numbers, and electronic serial numbers ("ESN"); metadata about cellular device operations (such as numbers dialed or texted, or webpages visited); and, most especially, the content of voice or video calls, text messages, emails, and application data;
>
> (4) What data in (3) may be stored by the Hailstorm simulator;
>
> (5) What data in (4) are accessible by law enforcement officers; and

(6) All means by which the Hailstorm simulator was configured to minimize data collection from third party cellular devices not belonging to Andrews.

*Id.* at 238.  The Court further demanded that Appellees disclose "any formal or informal policies, practices, or procedures that prevented BPD officers seeking a warrant or pen register/trap and trace order from stating to the reviewing magistrate that a [CSS] would be used." *Id.*

The parties engaged in supplemental discovery, including attempts to secure more detailed information from Hailstorm's manufacturer, L3Harris.  Andrews attempted to obtain the applicable Hailstorm operator's manual, as information contained therein was, and remains, essential to answering this Court's questions. L3Harris refused to provide the manual, instead providing only a "start up guide" and "quick start guide."  SA 1490-1543.  After attempting to dodge whether such a manual exists, L3Harris's representative, Stanley Gutowski, conceded one does, but contended no such manual was provided to Appellees.  SA 1162-64.  Gutowski was asked "does an operator's manual exist for *the* Hailstorm?"  SA 1163-64 (emphasis added).  Gutowski responded "[y]es, we have *an* operator's manual." SA 1164. (emphasis added).  He *did not* state that L3Harris possesses different manuals for different Hailstorms, and he never claimed counsel improperly sought information about the wrong, or an additional, Hailstorm, or that at all suggest that counsel sought anything other than relevant information regarding the Hailstorm

5

device used to locate Andrews.  Gutowski later admitted that the manual would likely contain information regarding data logging preferences and their configuration, key components of this Court's remand order.  SA 1344; *Andrews*, 8 F.4th at 238 (questions 4 and 6).  And despite L3Harris contending that Appellees, and indeed any other local law enforcement agency, did not receive operator's manuals, former BPD Officer David Rosenblatt testified that as early as 2001, officers had access to a hard copy of an operator's manual.  SA 400.

Despite subsequent repeated efforts to obtain the manual, L3Harris refused to provide it.  Andrews sought to compel its production, and L3Harris remarkably responded that: a) L3Harris indeed provided the manual for "the device used to locate Andrews," despite not having done so, and b) the requested "additional" Hailstorm manual was not a manual for "the device used to locate Andrews," and thus not responsive to the document request and subpoena.  SA 360-61.  Gutowski newly claimed that the operator's manual referenced in his deposition was for an "additional" and "sensitive and highly confidential" Hailstorm manual that described functionalities not available to local law enforcement operators.  SA 1114.

The District Court denied compelling production of the manual, accepting as true Gutowski's nascent obfuscation that the manual referenced in his deposition was not for the Hailstorm used to locate Andrews, and positing that Andrews could

only speculate that any such operator's manual might contain useful information. SA 347. The court also noted, and apparently accepted as sufficient, that L3Harris provided the Quick Start Guide as submitted to Appellees, SA 1490-1543, and does not provide operator's manuals to customers. *Id.* The court said nothing regarding Gutowski having previously admitted that at least one Hailstorm operator's manual exists and contains responsive information, *see* SA 1344, and failed to explain the relevance of the fact that L3Harris does not provide customers with operator's manuals.

Appellees subsequently filed Motions for Summary Judgment on July 1, 2024, claiming to be eligible for qualified immunity and public official immunity. SA 995-1045. On March 4, 2025, the District Court entered an indicative ruling, stating that the court would grant the Summary Judgment Motions if the court retained jurisdiction to do so. SA 45-66, 806-27. On April 23, 2025, this Court remanded the case back to the District Court for the limited purpose of ruling on the summary judgment motions. ECF No. 61.

On May 1, 2025 the District Court granted Appellees' Summary Judgment motions. SA 19-44, 780-805. The court initially briefly discussed the previously-denied request to compel production of the operator's manual, confirming the court's prior conclusion that "*the* operator's manual" did not apply to Appellees'

7

Hailstorm, and that L3Harris had produced the supposedly-sufficient Quick Start Guide.  SA 24-25, 785-86.

Turning to this Court's factual inquiries, the District Court repeatedly discussed how Appellees allegedly deployed their particular Hailstorm, rather than responding to this Court's broader inquiry as to the Hailstorm's functional capabilities.  The court first found that the Hailstorm's maximum range ███████ ███████  SA 27, 788.  The court noted the parties' agreement ███████

███████████████████████████████████████████████████

███████████████████    SA 26-27, 787-88.  ███████████████

███████████████████████████████████████████████████

███████████████████  *Id.* (citing SA 1247-48).  Its range also depends on its

███████████████████████████████████████████████████

*Id.* (citing SA 1243-44).  Appellee Officer Haley speculated that a Hailstorm had a

███████████████████, and noted that the device does not provide a distance to target, but rather points the operator in the direction of the signal while providing a signal strength indication.  SA 27, 109, 788.

The court then discussed the maximum number of devices to which the Hailstorm could connect, ███████████████████.  SA 27-28, 788-89.

███████████████████████████████████████████████████

███████████████████████████████████████████.  *See* SA

8

483-84.  The court, though, speculated, or rather "conservatively estimated," without any factual support for doing so, that a Hailstorm could connect to twenty-five percent of devices within its range.  SA 27-28, 788-89.

Regarding data collection, the court concluded that Hailstorms "only" collect phones' electronic identifier numbers ███████████.  SA 28, 789. This, despite Officer Haley testifying that █████████████████████████ █████████████████████████████████████████████████████ ███████████████████, SA 171-72, and Gutowski adding ███████████ ████████████████████████████████████████.  SA 1249-56.  The court concluded that a Hailstorm "does not collect metadata, numbers dialed, the content of voice or video calls, a record of text messages or their content, a record of web pages visited, the content of any emails, any application data about cellular device operations, photographs stored on phones, or any content stored on a phone."  *Id.*  The court entirely ignored the primary data a Hailstorm collects: ████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████.  "[I]t connects with ████████████████████████████████████████ ████████████████████████████████████."  SA 1242.  The court also

ignored that Hailstorms ████████████████████████████████

████████████████████████████. SA 1271, 1370-71.

Regarding data storage, the District Court concluded that Hailstorms "only" store targeted phones' "electronic identifier ████████████████████████

█████████████████████████████████████████████

████████."'" SA 37, 790, SA 37 (citing SA 1320). The court overlooked that in non-default mode, Hailstorms may collect data ████████████████████████

████████████████████████████████████████████████

████████████████████████████. SA 1261-63, 1265. The court noted, and apparently accepted as a sufficient safeguard, ████████████████

████████████████████████████. SA 37, 790 (citing SA 1261-63). The court observed that Officer Haley testified he purged Hailstorm data daily, and never otherwise stored or backed up such data. *Id.* (citing SA 174). The court, however, also entirely ignored that a Hailstorm's maximum data storage capacity remains unknown. *See* SA 438. This Court, however, asked what data a Hailstorm can store, not how it was deployed, or purged, here. *Andrews*, 8 F.4th at 238.

With respect to what data law enforcement officers may access, the court discussed how Appellees stored their Hailstorm in a locked vehicle in a secure garage with limited access, as well as that data remains stored on the device. SA

10

37-38, 790-91.  The court conceded, however, that anyone with full access to a Hailstorm could access any data stored on it, and that Hailstorm-collected data can be extracted onto a thumb drive.  SA 37, 790 (citing SA 344-45, 1607, 1610).  The court speculated that "no data at all was stored" on Appellees' Hailstorm because they regularly purged the unit and did not modify it from default mode.  SA 38, 791.  The court ignored that thumb drive transferable data could include data for *any and all devices to which a Hailstorm connected* during a search, SA 344, and that a Hailstorm ███████████████████████████████████████.  SA 1372.

Turning to Hailstorm configuration to minimize data collected from phones not belonging to Andrews, the District Court found no evidence that Appellees' Hailstorm was reconfigured from its default mode, and that even if it ever were, the ████████████████████████████████████.  SA 38-39, 791-92.  The court conceded that Appellees' Hailstorm was not reconfigured to avoid collecting third-party data, and ignored that an operator's manual would likely contain information on how to reconfigure the device, to perhaps both limit and expand the scope of collected data.  *Id.*

Regarding whether Appellees' had any formal or informal policies, practices, or procedures that prevented them from seeking a warrant or pen register / trap and trace order ("PRO") that mentioned a CSS, the court concluded no such

11

policy existed.  SA 39-40, 792-93.  The court further noted that "cellular tracking device" as used in the pen register Application and Order used here constitutes a synonym for "cell-site simulator."  *Id.* (citing SA 1302-03, 1425).  The court apparently rejected as irrelevant that Appellees' Nondisclosure Agreement ("NDA") with the FBI, which requires Appellees to obtain written permission to disclose the use of a Hailstorm in any criminal or civil proceeding, as well as entirely discounted the uncertainty surrounding the NDA's impact on whether Appellees could mention their intent to use a Hailstorm to locate Andrews when seeking a warrant or PRO.  *Id.* (citing *Andrews*, 134 A.3d at 337-38).

Based on the new factual findings, the District Court turned to the Fourth Amendment issues, and confirmed that, given the Hailstorm's capabilities, Appellees conducted a search that required a warrant.  SA 33-41, 794-802.  The court then held, albeit with reservations, that the PRO was sufficiently particular in defining the type of search Appellees intended to conduct, and thus equated to a warrant, given that it authorized "real time . . . cellular tracking" by an "unnamed 'Cellular Tracking Device.'"  SA 36-39, 797-800.  The court further noted that Appellees sufficiently narrowed the search's scope, having identified a suspect.  SA 39, 800, SA 39.  The court expressed concern that Appellees likely should have obtained a search warrant rather than a PRO, but found that Appellees were not dishonest or intentionally concealed information from the issuing judge.  *Id.*

12

The court then determined that Appellees' search was reasonable as executed, inasmuch as they collected only information necessary to locate Andrews.  SA 39-41, 800-02.  The court noted, incorrectly, that a Hailstorm "collects no data from third parties," despite entirely contrary record evidence.  SA 40, 801.

The court concluded that even if using the Hailstorm constituted a Fourth Amendment violation, the Appellee Officers enjoy qualified immunity.  SA 41-43, 802-04.  The court reasoned that Andrews enjoyed no clearly established right to be free from a warrantless CSS search, given that no such law was clearly established as of 2014, and the applicable law remains in flux today.  SA 41-42, 802-03.  As such, the court found that the Officers did not knowingly violate any possibly applicable law.  SA 43, 804.  The court then found that the Officers acted within the scope of their official capacities, were not dishonest seeking the PRO, and did not act with any level of negligence, such that Maryland public official immunity applied.  *Id.*  Lastly, regarding *Monell* liability, the court concluded the BPD's NDA with the FBI, and the Officers' failure to specifically mention their intent to deploy the Hailstorm when seeking the PRO, did not engender a constitutional violation.  SA 43-44, 804-05.  The court reasoned that identifying the Hailstorm was "not necessary for the warrant to be sufficiently particular," and that at best, the NDA compelled BPD employees to avoid disclosing the

13

Hailstorm's name or specific functionality.  SA 44, 805.  This Court's Supplemental Briefing Order followed on May 6, 2025.  Fourth Circuit ECF no. 62.

## SUMMARY OF THE ARGUMENT

The District Court's opinion, once again, reads as if the court made its decision and worked backwards to find the necessary support.  The court plainly failed to read the facts in the light most favorable to Andrews, made multiple factual errors along the way, and misconstrued numerous issues.  The court also abused its discretion refusing to compel production of *the* operator's manual for *the* device used to locate Andrews, making clearly erroneous factual findings in doing so.  The manual undeniably contains responsive and probative information, confirmed through deposition testimony, that would enable the parties to fully answer this Court's remanded inquiries.  The District Court also erred, again, in holding that the PRO BPD obtained to locate Andrews via his cell phone, and subsequently obtain evidence against him, equated to a warrant.  PROs do not require probable cause, and merely using the words "probable cause" in a PRO application, without explaining *of what* the applicant has probable cause, does not magically convert a PRO into a viable search warrant.  The PRO also failed to satisfy both the probable cause and the particularity requirement of the Fourth Amendment.  The Officers also should not enjoy qualified or public official

14

immunity, given that they deliberately, or at a minimum, recklessly, failed to disclose their intent to deploy a Hailstorm, or any of its functional capabilities. Lastly, BPD cannot avoid *Monell* liability where the NDA precluding disclosure of their Hailstorm use or its functionality to courts establishes an unconstitutional policy and practice.

## APPLICABLE STANDARD OF REVIEW

This Court "reviews *de novo* a District Court's award of summary judgment." *Wilson v. Prince George's Cty., Md*, 893 F.3d 213, 218–19 (4th Cir. 2018) (citing *Meyers v. Balt. Cty., Md.*, 713 F.3d 723, 730 (4th Cir. 2013)). Summary judgment is appropriate only when there is "no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Meyers*, 713 F.3d at 730.

This Court "construes the evidence in the light most favorable to the non-moving party." *Wilson*, 893 F.3d at 218–19; *Gen. Ins. Co. of Am. v. United States Fire Ins. Co.*, 886 F.3d 346, 353 (4th Cir. 2018), *as amended* (Mar. 28, 2018).

The Court reviews for an abuse of discretion a district court's decision denying a motion to compel. *Brooks v. Johnson*, 924 F.3d 104, 121-22 (4th Cir. 2019). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of

15

discretion, relies on [clearly] erroneous factual or legal premises, or commits an error of law." *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007). While a high standard, the trial court's discretion to manage discovery "is not boundless," and the Court may find an abuse of discretion if the trial court denies access to highly relevant evidence where its production would not impose a high burden or substantial expense. *Id.* at 121. Furthermore, a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 125 (4th Cir. 2011) (quoting *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573 (1985) (internal quotation omitted)), based on the clear weight of the record as a whole. *United States v. El Shafee Elsheikh*, 103 F.4th 1006, 1022 (4th Cir. 2024) (quoting *United States v. Ferebee*, 957 F.3d 406, 417 (4th Cir. 2020)). Equally critical, if a trial court's reasoning based on the record evidence is "so flawed as to constitute clear error," the Court must correct that error. *Wileman v. Frank*, 979 F.3d 30, 38 (4th Cir. 1992).

## **ARGUMENT**

### V.    **THE DISTRICT COURT FAILED TO READ THE FACTS IN THE LIGHT MOST FAVORABLE TO ANDREWS**

The District Court's application of the new factual findings, when granting summary judgment, patently demonstrates the court failed to properly review the

facts in the light most favorable to Andrews. Throughout its decision, the court drew every inference and judgment call in favor of Appellees, violating the summary judgment standard. *See Wilson*, 893 F.3d at 218–19; *United States Fire Ins. Co.*, 886 F.3d at 353.

Most critically, the District Court found that the record did not reflect "any dishonesty or concealment" by the Officers when obtaining the PRO. SA 43, 804. On its face, the PRO application entirely omits any reference to the Hailstorm, and does not disclose anything, even vaguely, about the power of the technology they intended to deploy. SA 977. The court remarkably acknowledged that the Officers *should* have obtained a search warrant rather than a PRO, *and* that they should have "expressly asked to use a Hailstorm, or at least, a cell-site simulator." SA 38-39, 799-800. This willful cognitive dissonance entirely defies logic, especially given the Hailstorm's powerful nature. At a minimum, the Officers recklessly disregarded that the Officers should have advised the PRO-issuing judge of the forces being unleashed in some specific way. Reading the facts in the light most favorable to Andrews, the court should have considered this omission, whether deliberate or reckless, as central to numerous factors, including whether the PRO qualified as a search warrant, the Officers should enjoy qualified immunity or public official immunity, and whether the BPD should face *Monell* liability. A

17

jury should be allowed to decide whether the Officers' deliberately and dishonestly omitted critical information from the PRO application.

Relatedly, the District Court failed to properly read the facts surrounding the NDA in the light most favorable to Andrews. The court remarkably concluded that "[n]othing in the NDA proscribed officers from obtaining a warrant, or disclosing the kind of search they intended to perform to the issuing magistrate," and yet in the next sentence, concedes that "the NDA compelled BPD to avoid disclosing the name *or specific functionality of the Hailstorm.*" SA 44, 805.

With respect to the Hailstorm's functional capabilities, the core of this Court's remand, the District Court again entirely failed to view the facts in a light most favorable to Andrews. The court found that the Hailstorm's maximum range ███████████████████████████████████████████████. SA 26, 787. Regarding the maximum number of devices to which the Hailstorm could connect, the court inexplicably speculated that a Hailstorm could connect ████████ ██████████████████████████. SA 27-28, 788-89. Regarding data collection, the court concluded that Hailstorms "only" collect phones' electronic identifier numbers ███████████████, despite ample evidence to the contrary, and entirely ignored the primary data a Hailstorm collects, ██████████████, ███████████ ██████████. With respect to data storage, the court's conclusion that Hailstorms "only" store targeted phones' "electronic identifier ████████████████████,

18

██████████████████████████████████████████████

████████,'" entirely overlooked that Hailstorms ██████████████████

██████████████, and that a Hailstorm's maximum data storage capacity remains

unknown. SA 28-29, 789-90 (citing SA 1318). Regarding what data law

enforcement officers may access, the court inexplicably focused on how the

Officers here allegedly used their Hailstorm, speculating that "no data at all was

stored" on it because they regularly purged the unit and did not modify it from

default mode. SA 30, 791. The court entirely ignored that Hailstorms ████████

██████████████.

All of these facts, read in the light most favorable to Andrews, call into

question the constitutionality of the search, especially given the still-obscured

Hailstorm's true capabilities. The District Court violated the summary judgment

factual review standard, and thus the Court should vacate the court's grant thereof.

## VI. THE DISTRICT COURT ABUSED ITS DISCRETION REFUSING TO COMPEL PRODUCTION OF THE HAILSTORM OPERATOR'S MANUAL

The District Court unequivocally abused its discretion by refusing to compel

production of the Hailstorm operator's manual for the device used to locate

Andrews, especially in light of this Court's extremely specific remanded questions

demanding information regarding the Hailstorm's functional capabilities and

attendant constitutional concerns. *Andrews*, 8 F.4th at 238; *Brooks*, 924 F.3d at

121-22. The court acted arbitrarily and irrationally denying the request, and based the decision on clearly erroneous factual premises, resulting in prejudice to Andrews. *Delfino*, 510 F.3d at 470. The Court should thus remand this matter once again and instruct the District Court to order production of the Hailstorm manual for the device used to locate Andrews.

This Court's Opinion demanded a wide range of detailed information regarding the Hailstorm's functional capabilities, and the operator's manual for the Hailstorm used to locate Andrews would logically reveal the device's myriad capabilities, enabling a complete response to the Court's questions. *Andrews*, 8 F.4th at 238. Again, this Court, and others, previously expressed deep concerns about the Hailstorm's obscured capabilities, given that CSSs can potentially "'intercept outgoing calls and text messages' by sending 'signals, often indiscriminately, through the walls of homes, vehicles, purses, and pockets.'" *Id.* (citation omitted); *United States v. Patrick*, 842 F.3d 540, 545-52 (7th Cir. 2016, *cert. denied*, 138 S. ct. 2706 (2018) (Wood, J., Dissenting)).

Judge Wynn wisely cautioned during oral argument that the Supreme Court has instructed that when law enforcement deploys new technology, Courts, as crucial protectors against tyranny and government overreach, must be on "red alert" to ensure these practices do not violate the Fourth Amendment. Oral Argument at 32:35-43, https://www.ca4.uscourts.gov/OAarchive/mp3/18-1953-

20

20200128.mp3 ("Oral Argument").  Judge Wynn further expressed concern that while Appellees claimed that the Hailstorm was not exceeding the location function, the device could indeed potentially do so, and more discovery was (and unfortunately remains) needed to answer that question.  *Id.* at 35:32 – 36:00. Indeed, Judge Wood in *Patrick*, 842 F.3d at 547, cautioned that CSS software modifications enable the devices to "capture 'emails, texts, contact lists, images,' and other data, including potentially eavesdropping on conversations."  (quoting *Stephanie K. Pell & Christopher Soghoian, Your Secret Stingray's No Secret Anymore: The Vanishing Government Monopoly over Cell Phone Surveillance and Its Impact on National Security and Consumer Privacy*, 28 Harv. J.L. & Tech. 1, 11-12) (2014).  Presumably an operator's manual would reveal whether a Hailstorm is among the class of CSSs subject to such software modification, and remarkable capability expansions.

This Court sought information regarding the Hailstorm's maximum range, maximum number of cellular devices from which it can force a connection, all categories of data a Hailstorm can collect, what data it can store, and what stored data law enforcement officers can access.  *Andrews*, 8 F.4th at 238.  The sole inquiry specific to Andrews centered around what modifications the Officers employed to minimize third-party data collection when searching for Andrews.  *Id.*

21

Andrews reasonably believes that the applicable Hailstorm operator's manual would enable the parties to fully answer the Court's inquiries, and thus rationally sought to compel its production as a highly relevant document. The Quick Start Guide does not answer these questions. As a matter of common sense, rather than based on bald speculation as the District Court alleged, a more detailed operator's manual could, and should, reveal the true scope of the Hailstorm's functional capabilities and enable a proper and complete response to the Court's questions. Indeed, L3Harris's refusal to produce the Hailstorm manual strongly suggests that the manual may reveal that the device is far more capable than previously disclosed, and perhaps has capabilities that far exceed those deployed in this particular case, including functionalities that may patently violate the Fourth Amendment. Such powerful search capabilities also speak directly to why the Officers should have obtained a search warrant, rather than a PRO.

Indeed, while Gutowski complains that the operator's manual contains "sensitive and highly confidential" information, he unwittingly conceded that the manual described Hailstorm functionalities, allegedly, not available to local law enforcement operators. SA 363. Gutowski provided no further explanation of the "sensitive and highly confidential" information claim, and Andrews was never afforded an opportunity to review even a redacted version of the manual. The District Court conducted no *in camera* review of the manual. And the fact that

22

BPD has an NDA with the FBI regarding the Hailstorm that precludes mentioning its use in any civil or criminal proceeding similarly strongly suggests that the Hailstorm is far more capable than previously disclosed.  Moreover, the District Court's speculative conclusions attempting to answer this Court's inquiries reveal that more discovery, specifically of *the*, not *a*, Hailstorm operator's manual for the device used to locate Andrews, should occur.

The Hailstorm's manufacturer, L3Harris, and Appellees, somehow managed, through self-conflicting evidence, to convince the District Court that Andrews sought to review something other than the operator's manual for the Hailstorm device used to locate Andrews, and as a result, the District Court abused its discretion, relying on clearly erroneous facts to do so.  SA 347.  The District Court inexplicably accepted as true, in contradiction of clear deposition testimony, that "*the* operator's manual" Gutowski described did not apply to Appellees' Hailstorm.  *Id.*  The court entirely ignored that Gutowski plainly stated in his deposition that L3Harris has an owner's manual for the Hailstorm device used to locate Andrews: Andrews' counsel: "[D]oes an operator's manual exist for *the* Hailstorm?"  SA 1163-64 (emphasis added); Gutowski: "Yes, we have *an* operator's manual."  *Id.* (emphasis added).  And while he contended local law enforcement agencies do not receive operator's manuals, former BPD Officer

23

David Rosenblatt testified that as early as 2001, officers had access to a hard copy of a Hailstorm operator's manual. SA 400.

The District Court similarly entirely overlooked that Gutowski admitted that the manual would likely contain information regarding data logging preferences and their configuration, information directly responsive to this Court's remand order. SA 1346; *Andrews*, 8 F.4th at 238 (questions 4 and 6). Instead, the District Court arbitrarily and irrationally dismissed Andrews' search for relevant information in the operator's manual, indeed *concededly contained* in "the" operator's manual, as speculative. SA 1344.

At no point in his deposition testimony did Gutowski contend that counsel sought an operator's manual for any device other than the Hailstorm used to locate Andrews. He did not then state, or even suggest, that L3Harris possesses different operator's manuals for different Hailstorms, though that, of course, would be logical. And yet despite their acknowledged existence, Gutowski subsequently, and absurdly, complained that Andrews sought an operator's manual for an "additional" Hailstorm model, despite the fact that the discovery request, and indeed the entire discussion regarding the operator's manual, surrounded "*the* device used to locate Andrews." SA 362-63 (emphasis added). Gutowski further falsely claimed that L3Harris indeed provided the applicable manual, presumably referencing the Quick Start Guide. *Id.* L3Harris produced no such manual beyond

24

the Start Up Guide and Quick Start Guide.  Regardless, Andrews did not, and does not, seek to review just *any*, or an "additional," Hailstorm operator's manual; he simply seeks to review *the* operator's manual for "*the* device used to locate" him. *Id.*

The District Court also wholly failed to explain how whether law enforcement agencies receive manuals bears any relevance.  This Court's inquiries revolved around the Hailstorm's *capabilities*, not whether law enforcement officers received training on how to use every conceivable Hailstorm functionality or even had access to a manual.  *Andrews*, 8 F.4th at 238.  That BPD may have not had the manual for this particular Hailstorm does not at all diminish the manual's relevance to fully answering this Court's questions.

Turning to the District Court's contorted efforts to answer this Court's inquiries, the operator's manual could likely have helped the District Court avoid engaging in illogical and arbitrary speculation.  For example, the court found, based on absolutely no record evidence, that a Hailstorm can connect to twenty-five percent of the devices within its range.  SA 27-28, 788-89.  This conclusion defies explanation, inasmuch as any given location, such as, say, a large apartment building, could contain hundreds of cellular phones within the Hailstorm's range. While Andrews agrees that the number of devices to which the Hailstorm can connect ██████████████████████, the District Court's arbitrary speculation

25

reveals the illogical and clearly erroneous nature of the court's decision. Presumably, the applicable operator's manual could assist in resolving this question.

Similarly, regarding data collection, the court erroneously concluded that Hailstorms "only" collect phones' electronic identifier numbers ███████ ██████. SA 28, 789. Again, an operator's manual would likely state what data a Hailstorm can collect, especially given that data collection is among its primary functions. Furthermore, Officer Haley testified that a Hailstorm collects █████ ███████████████████████████████████████████. SA 171-72. Gutowski also conceded that Hailstorms collect ███████████. SA 1248-52. The court concluded that Hailstorms do not collect other sensitive data, but wholly ignored that a Hailstorm's primary targets are cell phone ██████ ██████████████████████████████████████████ ████████████. Gutowski admitted that Hailstorms connect to "███████ ████████████. SA 1242, 1368. The District Court entirely ignored this testimony.

The court also ignored Gutowski's testimony regarding data storage, and that Hailstorm's settings can be modified to display and store █████████ ████████████. SA 1261-63, 1265. The court ultimately failed to answer this Court's data storage question, instead focusing on how L3Harris ██████

26

███████████████████████████████████████, and that Officer Haley did so here.  Whether the Officers purged the device, or used only default mode, ignores that this Court sought information regarding Hailstorm *capabilities*, not how the Officers deployed it here, aside from the sixth question.

Relatedly, regarding what data law enforcement officers can access, the court ignored that thumb drive transferable data could include data for ██████ ████████████████████████████████████.  *See* SA 173.  Again, an operator's manual could likely shed light on what data a Hailstorm can store, and what data officers can access from it, rather than the myopic inquiry the District Court employed as to what data the Officers stored and accessed here.

With respect to what reconfigurations were made to minimize data collected from phones not belonging to Andrews, the District Court found no evidence that Appellees' Hailstorm remained in default mode, and that even if modified, the ████████████████████████████████████.  SA 30-31, 791-92. Remarkably, the court conceded that Appellees' Hailstorm was not reconfigured to avoid collecting third-party data.  *Id.*  The court, though, ignored that an operator's manual would likely contain information on how to reconfigure the device, to perhaps both limit and expand the scope of collected data.  Similarly, the court entirely overlooked that, given that a Hailstorm is malleable, *i.e.*, can be put into non-default modes, an enterprising user, even without the manual in hand, could

27

perhaps figure out how to nefariously modify the device and access impermissible functionalities. An operator's manual would almost certainly reveal these functional capabilities, and thus the District Court should have compelled production of the operator's manual for the device used to locate Andrews.

## VII.   THE PRO DID NOT SATISFY THE FOURTH AMENDMENT'S WARRANT REQUIREMENT.

### A. The District Court Correctly Concluded the Officers Conducted a Search Requiring a Warrant, Albeit While Making Clearly Erroneous Factual Findings

"The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"[1] *Carpenter v. United States*, 138 S. ct. 2206, 2213 (2018). "Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Kyllo v. United States*, 533 U.S. 27, 40 (2001). The sanctity of a private residence is paramount, and any law enforcement entry, subject to very

---

[1] Much of the proceeding PRO and warrant arguments were discussed in Andrews' opening brief. Because the District Court on remand expanded upon the prior decision, despite only limited additional discovery occurring with respect to the PRO, Andrews herein provides these arguments for the Court's convenience, and responds to the District Court's modifications to the prior underlying decision.

limited exceptions, requires a warrant. *Silverman v. United States*, 365 U.S. 505, 511 and n.4 (1961).

The District Court, in part based on BPD and the Commissioner's concessions, and agreeing with this Court, found that the Officers conducted a search requiring a warrant when they deployed the Hailstorm to locate Andrews. SA 33-35, 794-96; *see Andrews*, 8 F.4th at 236 (noting Appellees' concession that Andrews' phone was searched and that doing so required a warrant). The District Court, however, erroneously concluded that no third parties were searched, tied to the mistaken conclusion that the Hailstorm ███████████████████████ ███████████████. SA 35, 796. This, despite Gutowski's testimony that an operator can select an option to allow the system to display and store ███████ ████████████████████████████████.[2] SA 1261-63, 1265. Nonetheless, the District Court correctly agreed that Appellees conducted a search. SA 32-34, 793-

---

[2] Given this functional capability, the "fruit of the poisonous tree" concerns may apply. *See Wong Sun v. United* States, 371 U.S. 471, 488 (1963). ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████. While the record here does not indicate any such search sprawl occurred, such potentialities warrant consideration in terms of the constitutionality of the Hailstorm's broader, and still unknown, search capabilities.

95.  The court erred, however, finding that the PRO equated to a warrant authorizing that search.

### B. The PRO Issued Here Does Not Satisfy the Warrant Requirement of the Fourth Amendment

The Fourth Amendment states "no warrants shall issue, but upon *probable cause*, supported by Oath or affirmation, and *particularly describing the place to be searched*, and the persons or things to be seized." U.S. CONST. Amend. IV. (Emphasis added).  A PRO, however, is not a warrant, and the District Court wholly overlooked several key factors as to why, including that under Maryland law, PROs are not intended to authorize location tracking, use of Hailstorm or comparable devices, or seizure of the target, or any other, phone.  This massive oversight, among others, entirely taints the court's finding that the PRO equated to a warrant.  The PRO obtained here fails to satisfy fundamental warrant requirements, namely that it, with insufficient particularity, described the place to be searched or the person to be seized.

### i.    Maryland's Pen Register and Trap and Trace Statute Does Not Authorize Using Hailstorm or Comparable Devices

The District Court entirely disregarded that the PRO was, "ORDERED, pursuant to Section 10-4B-04 of the Courts and Judicial Proceedings Article of the Maryland Code. . ." JA 39, when finding that the PRO equated to a warrant.  Such orders are not the functional or legal equivalent of search warrants for several

30

reasons, and cannot authorize the collection of location information, or seizure of any phone, even if an Officer uses the magic words "probable cause" when seeking a PRO.

Maryland's Courts and Judicial Proceedings ("CJP") § 10-4B-01(c)(1) defines a pen register as "a device or process that records and decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." A trap and trace device ("TT"), under CJP § 10-4B-01(d)(1), includes only "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."[3] Issuance of a PRO requires a finding "that the information likely to be obtained by the installation and use is relevant to an ongoing criminal investigation." MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04(a)(1). Further, a PRO authorizes the agency to install a PR\TT device for sixty days. *Id.* at (c)(1). A search warrant, on the other hand, would have been valid for only fifteen days from the date of issuance. MD. RULE ANN. 4-601(d) (2014 Replacement Volume).

---

[3] Maryland's Pen Register and Trap and Trace statutes virtually verbatim mirror their federal counterparts, 18 U.S.C. §§ 3127, 2510; *see Chan v. State*, 552 A.2d 1351, 1361 (Md. App. 1989).

31

Neither a PRO or TT authorize collecting communication content, nor do they authorize obtaining location information or seizing any phone, whether physically or rendering it incapable of normal operation. CJP §§ 10-4B-01(c)(2), (d)(2); *see also Andrews*, 134 A.3d at 354-61 (402-13) (holding that Maryland's pen register statute does not apply to the use of CSSs, and that the PRO obtained here did not constitute a valid warrant). Stated simply, pen registers capture outgoing transmitted information from, and trap and traces capture incoming transmitted information to, a particular communication device specified in the Order. PRO applications require officers to satisfy a "less stringent" standard than probable cause. *In re United States for an Order Directing Provider of Elec. Commun. Serv. to Disclose Records to the Gov't*, 620 F.3d 304, 315 (3d Cir. 2010); *United States v. Newman*, 733 F.2d 1395, 1398 (10th Cir. 1984) ("The installation and use of a pen register is not a search for purposes of the Fourth Amendment.") (citing *Smith v. Maryland*, 442 U.S. 735, 742-46 (1979)).[4]

That PROs cannot authorize obtaining location information or seizing phones likely informs, at least in part, why the PRO and Application here wholly failed to mention that a Hailstorm or CSS would be deployed to locate Andrews. Strangely, the PRO applicant, Detective Spinnato, claimed to not know what a

---

[4] In state court, the State of Maryland implicitly conceded that the Open Register application exceeded the scope of CJP § 10-4B-03. *See Andrews*, 134 A.3d at 359.

Hailstorm is, or that one would be used pursuant to the PRO. SA 100-03. Through this subterfuge, Appellees successfully gamed the PRO and search warrant system, apparently including internally. That the District Court stated "[i]t would have been better, to be clear, if BPD had expressly asked to use a Hailstorm, or at least, a cell-simulator," cannot ameliorate that Detective Spinnato, whether knowingly or not, mislead the PRO-issuing magistrate, and that the Officers should have obtained a proper search warrant. SA 36, 799. Indeed, the PRO-authorizing judge should have at least been alerted as to what device the Officers intended to deploy, or at a minimum some clarity as to what "cellular device tracking" involves. The Fourth Amendment requires more, especially when the device deployed penetrated the walls of a private residence, the most sacred of Constitutionally-protected places. *Silverman*, 365 U.S. at 511.

Unlike pen registers and track and trace devices, Hailstorms do not passively intercept electronic communications. They broadcast a signal to initiate contact with a cellular phone, seize the signal, and then trace the received signal's location. The Communications Assistance for Law Enforcement Act ("CALEA"), describing telecommunications carriers' duties to cooperate in intercepting communications for law enforcement purposes, information acquired as authorized by a pen register "shall not include any information that may disclose the physical location of the subscriber." 47 U.S.C. § 1002.

33

Turning a cellular phone into a tracking device thus undeniably requires probable cause. *Andrews*, 134 A.3d at 56 (citing *In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth.*, 396 F. Supp. 2d 747, 759, 765 (S.D. Tex. 2005).[5] Accordingly, the United States Department of Justice, as of 2015, requires that before deploying a CSS, law enforcement agents must first obtain search warrants. *Justice News, Justice Department Announces Enhanced Policy for Use of Cell-Site Simulators*, DOJ 15-1084 (2015). Similarly, Maryland law now requires the equivalent of a search warrant supported by probable cause to obtain real-time cellular device tracking information. MARYLAND CRIMINAL PROCEDURE ARTICLE (CP) § 1-203.1 (effective Oct. 1, 2014); *see also United States v. Briscoe*, 101 F.4th 282, 293-95 (4th Cir. 2024) (upholding the use of a CSS pursuant to a probable-cause-supported court order issued under CP § 1-203.1).

> ii.    **Using *"probable cause"* does not convert the PRO into a warrant.**

"The traditional standard for review of an issuing magistrate's probable cause determination has been that, so long as the magistrate had a 'substantial basis for … concluding' that a search would uncover wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 263 (1983).

---

[5] Again, a CSS also seizes ████████████████████████████████
████████████████████. SA 1271, 1368-69.

Pursuant to Maryland law, a magistrate may issue a search warrant when there is probable cause to believe that a crime is being committed by a person or in a building, or the property subject to seizure is on a person or in a building. MD. CODE ANN., CRIM. PROC. § 1-203(b)(1).

The PRO stated: "the Court finds that probable cause exists and that the applicant has certified that the information likely to be obtained by the use of the above listed device(s) is relevant to an ongoing criminal investigation. . ." The District Court previously found this language instructive, holding "the PRO contains *both* a finding of 'probable cause' *and* a finding that the search is likely to yield information 'relevant to an ongoing criminal investigation.'" JA 175. (Emphasis in original). The court found that this bald language satisfied the probable cause requirement. The court failed to identify, however, *of what* it believed the Circuit Court judge found probable cause. JA 175. Although the District Court made clear it did not believe the words "probable cause" related to the words "information likely obtained by the use of the above listed device(s) is relevant to an ongoing criminal investigation," it did not indicate what it held the finding of "probable cause" to be. JA 175. On remand, the District Court affirmed the prior "probable cause" finding, but again without explaining *of what* the Officers had probable cause. SA 36, 797.

35

The District Court failed to read the "probable cause" sentence in full. The PRO stated: ". . . the Court finds that probable cause exists and that the applicant has certified that the information likely to be obtained by the use of the above listed device(s) is relevant to an ongoing criminal investigation. . ." JA 39. The probable cause stated in the PRO was that "the information likely to be obtained by the use of the above listed device(s) is relevant to an ongoing criminal investigation." The warrant requirement, however, mandates probable cause "to believe that contraband or evidence is located in a particular place." *Gates*, 462 U.S. at 238.

There could have been no legitimate finding of probable cause in the PRO because Detective Spinnato provided no facts to support that evidence sought (the location of Andrews' phone) was located in 5032 Clifton Ave. Indeed, the only address listed in the PRO is where the shooting occurred that gave rise to Andrews' arrest. SA 966. Rather, his PRO Application established only probable cause to believe a PR\TT of Andrews' phone may be relevant to an ongoing criminal investigation, which is a lower standard than the Fourth Amendment requires.

Even assuming arguendo that the term "probable cause" as used in the PRO holds the meaning required by the Fourth Amendment, the PRO does not and cannot be anything more than an order authorizing the use of a PR\TT device.

36

Again, it cannot authorize the use of a CSS, collection of location data, or phone seizures. Historical and real-time cell-site location information obtained from service providers is different than the information gained from using a CSS. Handheld CSSs allow officers to narrow the scope of the location of a targeted device. *See* Brian L. Owsley, *Triggerfish, Stingrays, and Fourth Amendment Fishing Expeditions*, 66 Hastings L.J. 183, 193-94 (2014) (discussing how law enforcement officers are able to move CSSs to "determine a fairly narrow geographical location where an individual is located."). Service providers are unable to pinpoint the precise location of a cell phone, whether it be in a car, house, or public street. JA 53. This shortcoming is the exact reason BPD needed to utilize the Hailstorm device. The portability of a handheld device allowed the detectives to move it in the direction indicated by the Hailstorm; when the signal strength increased, the detectives knew they were getting warmer. *Andrews*, 134 A.3d at 332 (Detective Haley testified that when the machine captures the targeted phone, it will provide the direction and strength of the signal: "Like if it says 1:00 at like an 80, well, then you know that you're kind of close to it. But if it says 1:00 at like a 40, then you know that you're probably within, I don't know, probably, you know, 20 yards of it.").

The information provided via Sprint, Andrews' service provider, lead the detectives to the 5000 block of Clifton Avenue, but could not direct them to the

exact house in which Andrews' phone was located.  The PRO-issuing judge did not authorize the Hailstorm's use, nor could he had even contemplated it.  Such a method of tracking the cell phone purposefully was never disclosed to him due to the NDA into which BPD and State's Attorney for Baltimore City had entered, as well as because the applicant supposedly did not even know what a Hailstorm is.  By utilizing the Hailstorm device, the detectives conducted an unconstitutional search outside the scope of the authorization to install a PR\TT device.

The Court's recent en banc review in *United States v. Chatrie*, 136 F.4th 100 (4th Cir. 2025) (en banc), provides useful guidance as to why the Officers here should have obtained a proper search warrant, rather than game the system by obtaining a PRO through subterfuge.  Judge Wynn, as joined by Judge Gregory and five other Circuit Judges, sagely quoted *Carpenter's* instructive warning that cell site location information falls into a "'qualitatively different category' of information," and that "'even a snapshot of precise location data'" presents a massive potential for intrusion into private realms.  *Id.* at 120 (Wynn, J., Concurring) (quoting *Carpenter*, 585 U.S. at 309; and *United States v. Smith*, 110 F.4th 817, 833 (5th Cir. 2024)).  Indeed, "[cell site location information] is extremely revealing of a person's private life," and may even exceed the intrusiveness of GPS tracking at issue in *United States v. Jones*, 565 U.S. 400

38

(2012). *Id.* at 137 (Richardson, J., Concurring) (discussing *Carpenter*, 585 U.S. at 309-15).

What is more disturbing here than *Chatrie*, however, which involved *historical* location data, is that the Officers could track Andrews' location *in real time*, and by peering through the walls of his home, thanks to the Hailstorm. Such a surreptitious intrusion into the home undeniably requires a search warrant supported by probable cause. *See Kyllo*, 533 U.S. at 40. Further, allowing law enforcement to deploy such devices "unchecked" could potentially chill myriad "associational and expressive freedoms." *Chatrie*, 136 F.4th at 130 (Wynn, J. Concurring) (citing *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring)). And as Judge Gregory noted, new technology should not be allowed to erode our constitutional protections and principles. *Id.* at 141 (Gregory, J., Dissenting).

Andrews does not contend the law enforcement should *never* be allowed to deploy a Hailstorm; rather, for them to do so, they must first obtain a valid search warrant. The Court thus, in the absence of a valid search warrant or equivalent court order authorizing Hailstorm use, should not excuse the improper, and unconstitutional, means Appellees employed here. They obtained a PRO, an order not subject to the far more strict warrant requirements, and without disclosing to the issuing judge the device to be used or any of its capabilities. The massive

39

privacy implications of doing so command strict adherence to the warrant requirements.

### iii. The PRO did not describe with particularity the apartment located at 5032 Clifton Ave as the place to be searched.

Probable cause requires finding that 'a fair probability that contraband or evidence of a crime will be found in a *particular* place." *Gates*, 462 U.S. at 238. (Emphasis added.)  The "particularity requirement" requires descriptions both of the place to be searched and the persons or things to be seized.  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  "A warrant may be so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid."  *United States v. Leon*, 468 U.S. 897, 932 (1984).  "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid."  *Groh*, 540 U.S. at 563.

The Founding fathers designed the Fourth Amendment to prevent the despised colonial era "'general warrants' and 'writ of assistance,' which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Carpenter*, 138 S. ct. at 2213 (quoting *Riley v. California*, 134 S. ct. 2473, 2494 (2014)).  "The manifest purpose of th[e] particularity requirement was to prevent general searches," and "ensures that the search will be

40

carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

When applying the particularity requirement to multi-unit residential building search warrants, "courts have declared invalid those warrants that fail to describe the targeted unit with enough specificity to prevent a search of all the units." *Garrison*, 480 U.S. at 91–92 (Blackmun, J., dissenting) (citing *United States v. Higgins*, 428 F.2d 232 (7th Cir. 1970); and *United States v. Votteller*, 544 F.2d 1355, 1362-1363 (6th Cir. 1976)); *see also Yanez-Marquez v. Lynch*, 789 F.3d 434, 462 (4th Cir. 2015). "A search warrant for an apartment house or hotel or other multiple-occupancy building will usually be held invalid if it fails to describe the particular subunit to be searched with sufficient definiteness to preclude a search of one or more subunits indiscriminately." 2 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 4.5(b), at 731 (5th ed. 2012) (citations omitted).

At oral argument, Appellees pivoted from their prior stance, newly claiming that Andrews' *phone* constituted the "place" to be searched pursuant to the PRO. Oral Argument at 18:18-28. Appellees did not, however, seek to seize, or even search, Andrews' phone pursuant to the PRO, though they indeed seized it, ███ ████████████████████████████████. The purpose of deploying the

41

Hailstorm was to *locate* the phone, and presumably Andrews with it.  Again, PROs cannot authorize obtaining location information, or phone seizures.  And as Judge Wynn noted during Oral Argument, while Appellees' counsel claimed that the phone was the "place" to be searched, in reality, Appellees "searched an *area*."  *Id.*

Detectives Spinnato and Haley searched each of the thirty to thirty-five apartments on the 5000 block of Clifton Avenue, using the Hailstorm to "peer over the wall of the home, to see if [Andrews'] cell phone [was] behind the wall of that house." *Andrews*, 134 A.3d at 331.  No warrant was issued authorizing such "wide-ranging exploratory searches." *Garrison*, 480 U.S. at 91–92 (Blackmun, J., dissenting).  Detective Spinnato could not have obtained, and did not obtain, a valid warrant to search the home of 5032 Clifton Avenue, because a warrant issued on the facts provided by Detective Spinnato would have rendered the warrant facially void as a general warrant. The application for a PRO made no mention of the 5000 block of Clifton Avenue, let alone the specific residence located at 5032 Clifton Ave.  Detective Spinnato's application is devoid of this information because he had no probable cause to believe evidence of a crime would be found there, so he had no reason to identify it as the place to be searched.

The District Court's holding that the "'particularity requirement does not demand 'a specification of the precise manner in which [the warrant is] to be executed'''" is premised on a misunderstanding of the extreme difference in

42

technology at issue.  SA 37, 798 (quoting *Dalia v. United States*, 441 U.S. 238, 257 (1979); *see also* JA 177.  The court previously held that the PRO "did not necessarily need to specify whether the officers planned to use a pen register or a CSS," but "[i]n an event, the PRO *did* authorize the BPD to 'employ surreptitious or duplication of facilities, technical devices or equipment to accomplish the installation and use of a Pen Register\Trap & Trace and Cellular Tracking Device' and to 'initiate a signal to determine the location of the subject's mobile device on the service provider's network. . ."  JA 177.  The court, however, once again misread the plain language of the PRO upon which it so relied.  The PRO authorized the use of surreptitious or duplication of technical devices *to accomplish the installation and use* of a PR\TT Device.  Further, the authorization to initiate a signal authorizes doing so *on the service provider's network.*

While a warrant need not specify the precise manner in which it is to be executed, a warrant cannot be interpreted to authorize an execution method that broadens the search scope identified by the issuing magistrate. Using a Hailstorm device drastically alters that scope, broadening from information obtained by Andrews' service provider to a search of all cell phones in the general vicinity of the device at the time it is activated until it is turned off.  Indeed, while Appellees relied heavily on *Dalia* during oral argument, Judge Wynn correctly observed that *Dalia* is a "totally different case" that involved far more disclosed information to

43

the magistrate judge in order to obtain a search warrant authorizing installation of a microphone "bug" in an office to intercept oral conversations. Oral Argument at 19:50-20:11. The Supreme Court in *Dalia* noted that the warrant application there included "the exact location and dimensions of [Dalia's] office and was restricted to" Dalia's communications regarding his underlying crime. *Dalia*, 441 U.S. at 256. The central issue was that warrant failed to specify that in order to install the bug, the officers would need to covertly enter Dalia's office. *Id.* at 245. Unlike the warrant application in *Dalia*, the PRO application here provided no specific location, or any geographic limitation for that matter, for the search, and thus failed to "particularly describe . . . the place to be searched." *Id.* Judge Wood, dissenting in *Patrick*, 842 F.3d at 548, also distinguished *Dalia* based on differences between the devices in question, a powerful CSS as compared to the otherwise-benign microphone deployed in *Dalia*.

The PRO also failed to specify the Hailstorm as the "cellular tracking device" to be deployed, leaving both the Applicant, and the issuing judge, in the dark as to the forces being unleashed. As Justice Bradley cautioned over a century ago, "silent approaches and slight deviations from legal modes of procedure" erode the Fourth Amendment and the protections it affords citizens, requiring that Courts "liberally construe" the Fourth Amendment to ensure its efficacy in the face of such encroachments. *Boyd v. United States*, 116 U.S. 616, 635 (1886). Allowing

44

Appellees, or any other law enforcement agency, to deploy a Hailstorm device, and without disclosing that they are doing so, as well as via a PRO rather than a search warrant, constitutes precisely the erosion Justice Bradley cautioned against.

### iv. BPD did not treat the PRO like a warrant until its conduct was challenged by Andrews.

The method with which BPD located Andrews was not disclosed to *anyone* for over a year, including the judge who issued the PRO. *Andrews*, 134 A.3d at 329-30. The first disclosure made regarding the technology came via email on May 6, 2015, five months after a specific discovery request for such information, from the Assistant State's Attorney ("ASA") assigned to the case. The email, directed to Andrews' defense counsel, indicated "it was [the ASA's] understanding that 'the ATT used a stingray to locate[ ] your client via his cell phone,' but that she was waiting for 'the paperwork.'" *Id.* at 360. Without the knowledge that such device even existed, knowledge expressly prohibited by the NDA signed by BPD, the Circuit Court judge could not have authorized its use.

"As a consequence of the nondisclosure agreement, rather than apply for a warrant, prosecutors and police obtained an order under the Maryland pen register statute that failed to provide the necessary information upon which the court could make the constitutional assessments mandated in this case." *Id.* at 376.

"Frequently – probably most frequently – the warrant papers including supporting affidavits are open for inspection by the press and public in the clerk's

45

office after the warrant has been executed." *Matter of Leopold to Unseal Certain Electronic Surveillance Applications and Orders*, 300 F.Supp.3d 61, 87 (D.D.C. 2018) (quoting *Baltimore Sun Co., v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989)). The court in *Leopold*, determining the First Amendment right of access to surveillance applications and orders, including PR/TT orders, distinguished orders granted pursuant to the Pen Register Act ("PRA") and the Stored Communications Act ("SCA") from search warrants. 300 F.Supp.3d at 87. It found that while search warrants and applications are generally accessible by the public after their execution, the SCA "is nestled between the PRA and wiretap statute within a statutory framework that broadly prioritizes law enforcement's need for secrecy over the public's interest in transparency." *Id.* The court held that the First Amendment did not entitle petitioners to access orders issued pursuant to the PRA or the SCA, as there existed no tradition of openness, nor were such orders "analogous to traditional search warrants" to be accessible under the "judicially-recognized history of openness" of search warrants. *Id.* at 86.

The PRO here "ordered that th[e] order and application be sealed until further Order of the court." JA 45. It was issued pursuant to Section 10-4B-04, which provides in subsection (d) that orders authorizing installation and use of a PR\TT device be sealed, and the application of such device remain confidential.

46

MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04(d).  This contradicts the general

policy of openness of search warrants following their execution.

In *Wilson v. Arkansas*, 514 U.S. 927 (1995), the Supreme Court held that the

principle of announcing a search warrant "is an element of the reasonableness

inquiry under the Fourth Amendment." 514 U.S. at 934.  There is "little doubt that

the Framers of the Fourth Amendment thought that the method of an officer's entry

into a dwelling was among the factors to be considered in assessing the

reasonableness of a search or seizure." *Id.*  Maryland Rule 4-601 provided, at the

time relevant to the case, that "upon the execution of a warrant, a copy of the

search warrant, application, and supporting affidavit. . . shall be left with the

person from whom the property is taken." MD. RULE ANN. 4-601(c) (2014

Replacement Volume).  The rule further allowed "a person aggrieved by the search

or seizure" to file an application for inspection and copy of the warrant.  MD. RULE

ANN.  4-601(g) (2014 Replacement Volume).

Maryland Criminal Procedure Article § 1-203.1, which came into effect after

BPD's search for Andrews, provides a process in which an officer may receive

authorization to obtain real-time location information from electronic devices, by

virtue of an order containing the grounds for obtaining such information.  MD.

CODE ANN. CRIM. PRO. § 1-203.1(b)(1)-(2); *see also* 2014 Md. Laws ch. 191

(effective Oct. 1, 2014). The statute includes safeguards "not found in the

47

Maryland pen register statute, including. . . a provision requiring notice to the user or owner of the monitored device within 10 days absent a showing of good cause to delay. *Andrews*, 134 A.3d at 407; MD. CODE ANN. CRIM. PRO. § 1-203.1(d)(1)–(3). Andrews did not receive notice of the search conducted by BPD through Hailstorm until over a year after the illegal search occurred. Had BPD considered the PRO to be a search warrant, it would have provided notice in accordance with the requirements of traditional search warrants.

Moreover, the use of surveillance technology, including CSSs, has become increasingly more rampant in the past decade. *See* Brian L. Owsley, *Triggerfish, Stingrays, and Fourth Amendment Fishing Expeditions*, 66 Hastings L.J. 183, 193–94 (2014) ("Whatever these devices are called, they have proliferated in recent years. . ."). Law enforcement agencies show no intention to stop utilizing the hottest surreptitious devices on the market to conduct their investigations. "We know nothing about the way in which the [Hailstorm] device … was configured, nor do we know the extent of its surveillance capabilities." *Patrick*, 842 F.3d at 546–47. The blanket NDA signed and abided by BPD engraves into stone the secrecy surrounding BPD's CSS utilization. In the face of this reality, the law must continually attempt to keep up with the proliferation of such technology to guard the protections provided by the Fourth Amendment. Susan Freiwald, *The Carpenter Chronicle: A Near-Perfect Surveillance*, 132 Harv. L. Rev. 205, 205

48

(2018) ("[T]here is often a significant lag time between the arrival of new law enforcement technologies and the laws regulating their use.").

## VIII. THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY AND PUBLIC OFFICIAL IMMUNITY

### A. Qualified Immunity

Whether officers are entitled to qualified immunity presents a question of law the Court reviews *de novo*, "'accepting the facts as the district court viewed them.'" *Putman v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023) (quoting *Iko v. Shreve*, 535 F.3d 225, 234, 237 (4th Cir. 2008)); *see also Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) (noting that the Court reviews *de novo* a summary judgment grant based on qualified immunity). The Court, however, lacks jurisdiction over whether material factual disputes precluded summary disposition based on qualified immunity. *Id.* (quoting *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 275 (4th Cir. 2011)).

Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The doctrine weighs two important values: "the need to hold public officials accountable when they exercise power irresponsibly" and "the need to shield officials from harassment, distraction, and liability when they perform their

49

duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Whether their conduct was "objectively reasonable" constitutes a question of law. *Malley v. Briggs*, 475 U.S. 335, 344 (1986).

In conducting the qualified immunity analysis, a court's "first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). Importantly, courts must define the right allegedly violated at the "appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (stating, "[a]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.") (emphasis added). After that has occurred, then—and only then—can a court properly determine whether clearly established statutory or constitutional law was "pre-existing," "obvious," and "mandatory" enough to place an official on notice about the apparent unlawfulness of his or her conduct. *See e.g., Hope v. Pelzer*, 536 U.S. 730, 741-46 (2002); *United States v. Lanier*, 520 U.S. 259, 271 (1997); *see also Graham v. Conner*, 490 U.S. 386, 394 (1989); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015); *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Andrews' right to privacy and to not be subjected to a warrantless search constitute two rights the Officers violated, both in obtaining the PRO without

50

disclosing the Hailstorm or its functionalities, and when deploying the Hailstorm to see through the walls of a private residence to seize his phone and locate him.

In 2002, the Supreme Court overturned an Eleventh Circuit opinion applying a long-held but erroneous standard that required an official's conduct to be "materially similar" to the facts of prior cases in order to clearly establish alleged, unlawful conduct. *Hope*, 536 U.S. at 741-46. In *Hope*, the Court condemned the Eleventh Circuit's analytical approach as a "rigid gloss" that contradicted the Court's precedent regarding the proper analytical approach to employ when deciding whether decisional law provided public officials with fair warning about their conduct's alleged unlawfulness. *Id. See also Lanier*, 520 U.S. at 271.

This Court must not only consider "specially adjudicated rights," but also "those manifestly included within more general applications of the core constitutional principles invoked." *Wall v. Wade*, 741 F.3d 492, 502-03 (4th Cir. 2014) (quoting *Pritchett v. Alford*, 973 F.2 307, 314 (4th Cir. 1992)). In other words, defendants "can still be on notice that their conduct violates established law even in novel factual circumstances []" so long as the law provided "fair warning" that their conduct was unconstitutional. *Hope*, 536 U.S. at 741.

### 1. Conducting the qualified immunity analysis

After defining the right allegedly violated, the Court then engages in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the

51

right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts have discretion to take these steps in either order. *Pearson,* 555 U.S. at 236. In conducting the established analysis, a court must examine cases of controlling authority in the relevant jurisdiction—that is, "decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose," *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Owens ex rel. Ovens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (other citations omitted).

### 2. The District Court Erroneously Concluded that the Officers Did Not Violate Clearly Established Law

The District Court misunderstood the "clearly established" law at issue when finding the Officers entitled to qualified immunity. A "right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 135 S.Ct. 348, 350, (2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The unlawfulness of the official's conduct must be "apparent" in "light of pre-existing law." *Anderson*, 483 U.S. at 640. To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Here, the Officers failed to disclose to the magistrate judge that they intended to deploy a CSS. "[T]he Supreme Court has long held that a police

officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts." *Miller v. Prince George's County*, 475 F.3d 621, 631 (4th Cir. 2007) (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)). Indeed, Detective Spinnato contended that he, the affiant who sought the PRO, did not know a CSS would be deployed. SA 100-03. Such reckless disregard when intending to conduct a search that would penetrate the walls of a private residence unquestionably presents a violation of clearly established constitutional law.

The District Court, however, focused on whether the "right at issue . . . is to be free from a warrantless search by a CSS." SA 42, 803.[6] While certainly relevant, the Officers' deliberate, or at a minimum, failure to disclose to the PRO-issuing judge that they intended to deploy such a device set this ball in motion, and *that* violation of clearly established law precludes them from enjoying qualified immunity. *Miller*, 475 F.3d at 631.

But even if the District Court properly framed the question, the analysis still missed the mark. That the Officers need a proper *search warrant*, supported by probable cause, and not a PRO, which has no probable cause requirement, to conduct a search within the walls of a private residence using powerful technology

---

[6] The District Court assumed arguendo that the search lacked a warrant. SA 42 n.7, 803 n. 7. Andrews maintains, as argued above, that the PRO fell short of qualifying as a search warrant, and thus that this search was indeed warrantless.

has long been established law.  This includes deploying technology that can penetrate said walls.  *Kyllo*, 533 U.S. at 40.  Indeed, the Supreme Court decided *Kyllo* in 2001, over a decade prior to the Officers' warrantless search in 2014.  As such, the Officers' unreasonable, if not contemptuous, conduct obtaining a PRO, when an objectively reasonable officer would know that they needed a search warrant, precludes them from enjoying qualified immunity.

The District Court focused too narrowly on whether any court had previously held that deploying a CSS without a warrant violated the Constitution. SA 42, 803.  To be sure, no court as of 2014 had so specifically held.  Nonetheless, framed properly, the question at issue should not be anywhere near so specific. That officers need a search warrant supported by probable cause to search inside a home has been the law of the land, under the Fourth Amendment, since the United States' founding.  The Officers here, aware of the Hailstorm's powerful technological capabilities, deliberately avoided seeking a search warrant.  Such malfeasance should not entitle them to qualified immunity.

### B.  Public Official Immunity

While Andrews does not dispute that the Officers were acting in their official capacities as police officers when obtaining the PRO and executing the search, their deliberate obfuscation regarding the Hailstorm when obtaining the PRO disqualifies them from Maryland's common law public official immunity.

54

Public official immunity applies to "public officials … who perform negligent acts during the course of their discretionary … duties." *Houghton v. Forrest*, 989 A.2d 223, 227 (Md. 2010). Public official immunity, though, does not shield them from liability for intentional torts, malicious acts, or even gross negligence. *See Cooper v. Rodriguez*, 118 A.3d 829, 858 (Md. 2015). Malice, under Maryland law, includes "knowing and deliberate wrongdoing, ill-will or fraud." *Barbre v. Pope*, 935 A.2d 699, 714 (Md. 2007). Gross negligence is akin to reckless conduct, and whether the conduct exists typically depends on the facts and circumstances of the case and is usually a question for the jury. *See Cooper*, 118 A.3d at 845-46.

The Officers' failure to disclose their intent to deploy the Hailstorm, and thereby convert Andrews' phone into a real-time GPS tracker, at best constitutes gross negligence. Their failure appears intentional, and yet the District Court dismissed out of hand that they failed to sufficiently disclose their intentions, as well as excused them for not having obtained a proper search warrant, despite the clearly established law that searches of private residences require search warrants. Just as they should not enjoy qualified immunity, neither should they enjoy public official immunity.

## C. BPD Cannot Avoid *Monell* Liability

Under *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 690 (1978), if a municipality's employees commit unconstitutional acts pursuant to an

55

unconstitutional "official policy or custom," the municipality can be held liable for damages under 42 U.S.C. § 1983. The NDA here, which compelled the Officers to not disclose their intent to deploy a Hailstorm when obtaining the PRO, constitutes an unconstitutional policy, inasmuch as it drove the Officers to pursue a PRO, with wholly inadequate detail, rather than a search warrant.

The District Court, having found the PRO qualifies as a search warrant, erroneously concluded that while "the NDA compelled BPD employees to avoid disclosing the name or specific functionality of the Hailstorm," warrant particularity does not require such detail. SA 44, 805. Again, the PRO falls far short of qualifying as a warrant for myriad reasons, in large part for lack of *any* detail regarding the Hailstorm or its functional capabilities. And without question, the NDA at a minimum drove the Officers to not only fail to name the Hailstorm or its capabilities, but to also obscure the true nature of the search to be conducted, one any reasonable magistrate would know requires a proper search warrant.

## **CONCLUSION**

For the reasons stated above, Andrews requests that the Court reverse the District Court's grant of summary judgment and remand the case to the District Court for further proceedings.

Respectfully submitted,

  /s/  *Michael A. Pichini*
Michael A. Pichini
Michael C. Heyse
George S. Mahaffey
Goodell, DeVries, Leech & Dann
One South Street, 20th Floor
Baltimore, MD 21202
410-783-4000
map@gdldlaw.com
mheyse@gdldlaw.com
gsm@gdldlaw.com

*Attorneys for Appellant,*
*Kerron Andrews*

## APPLICABLE FEDERAL AND STATE STATUTES, RULES, AND REGULATIONS

### *Federal Statutes & Constitutional Amendment*

***U.S. CONST. Amend. IV.***

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

***18 U.S.C. § 2510***

As used in this chapter—

(1) "wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce;

(2) "oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication;

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

(4) "intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.[1]

a

(5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—

(a)any telephone or telegraph instrument, equipment or facility, or any component thereof,

(i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business; or

(ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

(b)a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

(6) "person" means any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation;

(7) "Investigative or law enforcement officer" means any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses;

(8) "contents", when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication;

(9) "Judge of competent jurisdiction" means—

b

(a) a judge of a United States district court or a United States court of appeals; and

(b) a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire, oral, or electronic communications;

(10) "communication common carrier" has the meaning given that term in section 3 of the Communications Act of 1934;

(11) "aggrieved person" means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed;

(12) "electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include—

(A) any wire or oral communication;

(B) any communication made through a tone-only paging device;

(C) any communication from a tracking device (as defined in section 3117 of this title); or

(D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds;

(13) "user" means any person or entity who—

(A) uses an electronic communication service; and

(B) is duly authorized by the provider of such service to engage in such use;

c

(14) "electronic communications system" means any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications;

(15) "electronic communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications;

(16) "readily accessible to the general public" means, with respect to a radio communication, that such communication is not—

    (A) scrambled or encrypted;

    (B) transmitted using modulation techniques whose essential parameters have been withheld from the public with the intention of preserving the privacy of such communication;

    (C) carried on a subcarrier or other signal subsidiary to a radio transmission;

    (D) transmitted over a communication system provided by a common carrier, unless the communication is a tone only paging system communication; or

    (E) transmitted on frequencies allocated under part 25, subpart D, E, or F of part 74, or part 94 of the Rules of the Federal Communications Commission, unless, in the case of a communication transmitted on a frequency allocated under part 74 that is not exclusively allocated to broadcast auxiliary services, the communication is a two-way voice communication by radio;

(17) "electronic storage" means—

    (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and

    (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication;

d

(18) "aural transfer" means a transfer containing the human voice at any point between and including the point of origin and the point of reception;

(19) "foreign intelligence information", for purposes of section 2517(6) of this title, means—

    (A) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—

        (i)     actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

        (ii)    sabotage or international terrorism by a foreign power or an agent of a foreign power; or

        (iii)   clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

    (B) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—

        (i)     the national defense or the security of the United States; or

        (ii)    the conduct of the foreign affairs of the United States;

(20) "protected computer" has the meaning set forth in section 1030; and

(21) "computer trespasser"—

    (A) means a person who accesses a protected computer without authorization and thus has no reasonable expectation of privacy in any communication transmitted to, through, or from the protected computer; and

    (B) does not include a person known by the owner or operator of the protected computer to have an existing contractual relationship with the owner or

e

operator of the protected computer for access to all or part of the protected computer.

*18 U.S.C. § 3127*

As used in this chapter—

(1) the terms "wire communication", "electronic communication", "electronic communication service", and "contents" have the meanings set forth for such terms in section 2510 of this title;

(2) the term "court of competent jurisdiction" means—

   (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that—

       (i)    has jurisdiction over the offense being investigated;

       (ii)   is in or for a district in which the provider of a wire or electronic communication service is located;

       (iii)  is in or for a district in which a landlord, custodian, or other person subject to subsections (a) or (b) of section 3124 of this title is located; or

       (iv)   is acting on a request for foreign assistance pursuant to section 3512 of this title; or

   (B) a court of general criminal jurisdiction of a State authorized by the law of that State to enter orders authorizing the use of a pen register or a trap and trace device;

(3) the term "pen register" means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication, but such term does not include any device or

f

USCA4 Appeal: 18-1953      Doc: 91      Filed: 09/24/2025      Pg: 75 of 84

process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device or process used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business;

(4) the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;

(5) the term "attorney for the Government" has the meaning given such term for the purposes of the Federal Rules of Criminal Procedure; and

(6) the term "State" means a State, the District of Columbia, Puerto Rico, and any other possession or territory of the United States.

## *42 USC § 1983*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

***Communications Assistance for Law Enforcement Act ("CALEA") 47 U.S.C. §
1002 - Assistance capability requirements***

(a) Capability requirements

Except as provided in subsections (b), (c), and (d) of this section and sections
1007(a) and 1008(b) and (d) of this title, a telecommunications carrier shall ensure
that its equipment, facilities, or services that provide a customer or subscriber with
the ability to originate, terminate, or direct communications are capable of—

(1) expeditiously isolating and enabling the government, pursuant to a court order
or other lawful authorization, to intercept, to the exclusion of any other
communications, all wire and electronic communications carried by the
carrier within a service area to or from equipment, facilities, or services of a
subscriber of such carrier concurrently with their transmission to or from the
subscriber's equipment, facility, or service, or at such later time as may be
acceptable to the government;

(2) expeditiously isolating and enabling the government, pursuant to a court order
or other lawful authorization, to access call-identifying information that is
reasonably available to the carrier—

(A) before, during, or immediately after the transmission of a wire or
electronic communication (or at such later time as may be acceptable to
the government); and

(B) in a manner that allows it to be associated with the communication to
which it pertains, except that, with regard to information acquired solely
pursuant to the authority for pen registers and trap and trace devices (as
defined in section 3127 of title 18), such call-identifying information shall
not include any information that may disclose the physical location of the
subscriber (except to the extent that the location may be determined from
the telephone number);

(3) delivering intercepted communications and call-identifying information to the
government, pursuant to a court order or other lawful authorization, in a
format such that they may be transmitted by means of equipment, facilities,
or services procured by the government to a location other than the premises
of the carrier; and

h

(4) facilitating authorized communications interceptions and access to call-identifying information unobtrusively and with a minimum of interference with any subscriber's telecommunications service and in a manner that protects—

    (A) the privacy and security of communications and call-identifying information not authorized to be intercepted; and

    (B) information regarding the government's interception of communications and access to call-identifying information.

(b) Limitations

  (1) Design of features and systems configurations

This subchapter does not authorize any law enforcement agency or officer—

    (A) to require any specific design of equipment, facilities, services, features, or system configurations to be adopted by any provider of a wire or electronic communication service, any manufacturer of telecommunications equipment, or any provider of telecommunications support services; or

    (B) to prohibit the adoption of any equipment, facility, service, or feature by any provider of a wire or electronic communication service, any manufacturer of telecommunications equipment, or any provider of telecommunications support services.

  (2) Information services; private networks and interconnection services and facilities

The requirements of subsection (a) do not apply to—

    (A) information services; or

    (B) equipment, facilities, or services that support the transport or switching of communications for private networks or for the sole purpose of interconnecting telecommunications carriers.

i

(3) Encryption

A telecommunications carrier shall not be responsible for decrypting, or ensuring the government's ability to decrypt, any communication encrypted by a subscriber or customer, unless the encryption was provided by the carrier and the carrier possesses the information necessary to decrypt the communication.

(c) Emergency or exigent circumstances

In emergency or exigent circumstances (including those described in sections 2518(7) or (11)(b) and 3125 of title 18 and section 1805(e) of title 50), a carrier at its discretion may comply with subsection (a)(3) by allowing monitoring at its premises if that is the only means of accomplishing the interception or access.

(d) Mobile service assistance requirements

A telecommunications carrier that is a provider of commercial mobile service (as defined in section 332(d) of this title) offering a feature or service that allows subscribers to redirect, hand off, or assign their wire or electronic communications to another service area or another service provider or to utilize facilities in another service area or of another service provider shall ensure that, when the carrier that had been providing assistance for the interception of wire or electronic communications or access to call-identifying information pursuant to a court order or lawful authorization no longer has access to the content of such communications or call-identifying information within the service area in which interception has been occurring as a result of the subscriber's use of such a feature or service, information is made available to the government (before, during, or immediately after the transfer of such communications) identifying the provider of a wire or electronic communication service that has acquired access to the communications.

j

## *Maryland Rules and Statutes*

### *MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-01(c)(1)-(2); (d)(1)-(2) (2014)*

(c) Pen register. --

(1) "Pen register" means a device or process that records and decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

(2) "Pen register" does not include any device or process used:

(i) By a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by the provider or any device used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business; or

(ii) To obtain the content of a communication.

(d) Trap and trace device. --

(1) "Trap and trace device" means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication.

(2) "Trap and trace device" does not include a device or process used to obtain the content of a communication.

### *MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-03 (2014)*

(a) In general. -- An investigative or law enforcement officer may make application for an order or an extension of an order under § 10-4B-04 of this subtitle authorizing or approving the installation and use of a pen register or a trap and trace device, in

k

writing, under oath or equivalent affirmation, to a court of competent jurisdiction of this State.

(b) Contents. -- An application under subsection (a) of this section shall include:

(1) The identity of the State law enforcement or investigative officer making the application and the identity of the law enforcement agency conducting the investigation; and

(2) A statement under oath by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency.

## *MD. CODE ANN., CTS. & JUD. PROC. § 10-4B-04 (c)(1); (d) (2014)*

(c) Duration. --

(1) An order issued under this section shall authorize the installation and use of a pen register or a trap and trace device for a period not to exceed 60 days.

(d) Restrictions. -- An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that:

(1) The order be sealed until further order of the court; and

(2) The person owning or leasing the line to which the pen register or a trap and trace device is attached or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court.

## *MD. RULE ANN. 4-601 (c); (d); (g)*

(b) Issuance of Search Warrant. The judge may issue a search warrant by (1) signing the warrant and recording on it the date and time of issuance, and (2) delivering the signed and dated warrant, along with a copy of the application

1

and affidavit, to the applicant in person, by secure facsimile, or by transmission of those documents by secure and reliable electronic mail that permits the applicant to print the complete text of the documents.

…

(d) Retention of Application and Affidavits--Secrecy.

(1) A search warrant shall be issued with all practicable secrecy. The judge may seal a supporting affidavit for up to 30 days, subject to one 30-day extension as provided in Code, Criminal Procedure Article, § 1-203(e).

(2) A judge who issues a search warrant shall retain a copy of the application, affidavit, and warrant until the warrant is returned, executed or unexecuted, pursuant to section (g) or (h) of this Rule. Upon return of an executed warrant, the judge shall comply with section (g). If the signed and dated warrant was transmitted to the applicant by electronic mail, the printed copy retained by the judge, upon its filing pursuant to section (g), shall be the original. A warrant, application, or affidavit shall not be filed with the clerk prior to its return to the judge pursuant to section (g) or (h).

…

(g) Executed Warrant--Filing With Clerk. The judge to whom an executed search warrant is returned shall attach to the warrant the return, the verified inventory, and all other papers in connection with the issuance, execution, and return, including the copies retained by the issuing judge, and shall file them with the clerk of the court for the county from which the warrant was issued. The papers filed with the clerk shall be sealed and shall be opened for inspection only upon order of the court. The clerk shall maintain a confidential index of the search warrants.

*MD. CODE ANN., CRIMINAL PROCEDURE § 1-203.1(b)(1)-(2); (d)(1)-(3) (effective Oct. 1, 2014)*

(b)(1) A court may issue an order authorizing or directing a law enforcement officer to use a cell site simulator or obtain location information from an electronic device

after determining from an application described in paragraph (2) of this subsection that there is probable cause to believe that:

     (i) a misdemeanor or felony has been, is being, or will be committed by the owner or user of the electronic device or by the individual about whom location information is being sought; and

     (ii) the information sought by the cell site simulator or the location information being sought:

          1. is evidence of, or will lead to evidence of, the misdemeanor or felony being investigated; or

          2. will lead to the apprehension of an individual for whom an arrest warrant has been previously issued.

(2) An application for an order under this section shall be:

     (i) in writing;

     (ii) signed and sworn to by the applicant; and

     (iii) accompanied by an affidavit that:

          1. sets forth the basis for probable cause as described in paragraph (1) of this subsection; and

          2. contains facts within the personal knowledge of the affiant.

…

(d)(1) Notice of the court's order shall be delivered to the user and, if known and if the owner is a person or an entity other than the user, the subscriber of the electronic device at issue.

(2) The notice shall:

n

(i) state the general nature of the law enforcement inquiry; and

(ii) inform the user or owner:

      1. if applicable, that a cell site simulator was used or that location information maintained by the service provider was supplied to a law enforcement officer;

      2. if applicable, of the identifying number associated with the electronic device;

      3. of the dates during which the cell site simulator was used or for which the location information was supplied;

      4. whether notification was delayed; and

      5. which court authorized the order.

(3) Subject to paragraph (4) of this subsection, notice must be delivered within 10 calendar days after the expiration of the order.

o

## REQUEST FOR ORAL ARGUMENT

Andrews requests an oral argument pursuant to Rule 34 of the Federal Rules

of Appellate Procedure.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 12,937 words in 14-point Times New Roman proportional text. The word processing program used to prepare this brief was Microsoft Word for Office 365.

/s/ *Michael A. Pichini*
Michael A. Pichini
*Attorney for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September, 2025, a copy of the foregoing Appellant's Corrected Sealed Supplemental Brief was filed and served electronically on the court's electronic-filing system on:

Ebony Thompson, Acting City Solicitor
Natalie Amato
Brent Schubert
Baltimore City Law Department, Suite 101
100 North Holliday Street
Baltimore, Maryland 21202

/s/ *Michael A. Pichini*
Michael A. Pichini
*Attorney for Appellant*