No. 18-1953

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

KERRON D. ANDREWS,

*Plaintiff-Appellant*,

v.

BALTIMORE POLICE DEPARTMENT; KEVIN DAVIS, Commissioner;
MICHAEL SPINNATO, Detective; JOHN HALEY, Detective,

*Defendants-Appellees*.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE**

_____

**APPELLEES' CORRECTED PUBLIC SUPPLEMENTAL
RESPONSE BRIEF**

_____

EBONY M. THOMPSON
  **Baltimore City Solicitor**
BRENT D. SCHUBERT
  **Deputy Chief, Office of Legal Affairs**
NATALIE R. AMATO
  **Chief Counsel for Consent Decree**
MICHAEL P. REDMOND
  **Chief Solicitor, Appellate Practice Group**
BALTIMORE CITY DEPARTMENT OF LAW
**100 N. Holliday Street, Suite 101
Baltimore, Maryland 21202
(443) 799-5767
brent.schubert@baltimorepolice.org
natalie.amato@baltimorepolice.org
michael.redmond@baltimorecity.gov**

*Counsel for Appellees*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE ISSUES .......................................................................... 3

STATEMENT OF THE CASE ............................................................................. 4

    I.    PROCEDURAL HISTORY ................................................................. 4

    II.    FACTUAL SUMMARY .................................................................... 5

SUMMARY OF THE ARGUMENT .................................................................... 6

STANDARD OF REVIEW .................................................................................. 9

    I.    SUMMARY JUDGMENT STANDARD ............................................. 9

    II.    ABUSE OF DISCRETION STANDARD APPLIES FOR
    DISCOVERY DECISIONS ............................................................... 11

ARGUMENT ..................................................................................................... 11

    I.    THE DISTRICT COURT PROPERLY APPLIED THE
    SUMMARY JUDGMENT STANDARD WHEN IT
    VIEWED THE FACTS IN THE LIGHT MOST
    FAVORABLE TO ANDREWS ......................................................... 11

        A.    The Pen Register Order and Nondisclosure Agreement ........... 12

        B.    No Genuine Disputes of Material Fact Exist Regarding
        Hailstorm's Technical Capabilities .......................................... 19

    II.    THE PEN REGISTER ORDER WAS A VALID COURT
    ORDER THAT SATISFIED FOURTH AMENDMENT
    WARRANT REQUIREMENTS ........................................................ 33

    III.    THE DISTRICT COURT DID NOT ABUSE ITS
    DISCRETION IN DENYING A MOTION TO COMPEL AN
    ADDITIONAL OPERATOR'S MANUAL ......................................... 40

    IV.    QUALIFIED IMMUNITY ............................................................... 46

    V.    PUBLIC OFFICIAL IMMUNITY .................................................... 50

i

VI.     ANDREWS'S APPEAL FAILS BECAUSE HE CANNOT
        MAINTAIN A § 1983 CLAIM FOR ALLEGED
        VIOLATIONS OF THIRD PARTIES' RIGHTS ..............................50

VII.    ANDREWS'S *MONELL* CLAIM FAILS AS A MATTER
        OF LAW ........................................................................................53

CONCLUSION ..............................................................................................55

CERTIFICATE OF COMPLIANCE.........................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allstate Financial Corp. v. Financorp, Inc.*,
934 F.2d 55 (4th Cir. 1991) ................................................................... 10, 41

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................9, 10

*Anglin v. Dir., Patuxent Inst.*,
439 F.2d 1342 (4th Cir. 1971) .......................................................................34

*Archuleta v. McShan*,
897 F.2d 495 (10th Cir. 1990) .......................................................................50

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .......................................................................................49

*Brigham City v. Stuart*,
547 U.S. 398 (2006) .......................................................................................35

*Carpenter v. United States*,
585 U.S. 296 (2018) ................................................................................. 47, 48

*Carter v. Morris*,
164 F.3d 215 (4th Cir. 1999) .........................................................................53

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................................9

*City of Canton v. Harris*,
489 U.S. 378 (1989) .......................................................................................53

*Connick v. Thompson*,
563 U.S. 51 (2011) .........................................................................................53

*Cybernet, LLC v. David*,
954 F.3d 162 (4th Cir. 2020) ............................................................. 9, 13, 35

*Dalia v. United States*,
441 U.S. 238 (1979) ................................................................. 13, 18, 34, 47

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ............................................................ 10, 19, 29

*Edwards v. City of Goldsboro*,
        178 F.3d 231 (4th Cir. 1999) ........................................................................47

*Garrett v. Clarke*,
        74 F.4th 579 (4th Cir. 2023) ........................................................................35

*Gomez v. Atkins*,
        296 F.3d 253 (4th Cir. 2002) ........................................................................46

*Harlow v. Fitzgerald*,
        457 U.S. 800 (1982)........................................................................................46

*Harrell v. DeLuca*,
        97 F.4th 180 (4th Cir. 2024) ...........................................................................9

*Howerton v. Fletcher*,
        213 F.3d 171 (4th Cir. 2000) ........................................................................50

*In re Search of Info. Stored at Premises Controlled by Google LLC*,
        579 F. Supp. 3d 62 (D.D.C. 2021)................................................................52

*Jackson v. Kimel*,
        992 F.2d 1318 (4th Cir. 1993) ......................................................................11

*Kyllo v. United States*,
        533 U.S. 27 (2001)..........................................................................................49

*Maciariello v. Sumner*,
        973 F.2d 295 (4th Cir. 1992) ................................................................. 46, 50

*Malley v. Briggs*,
        475 U.S. 335 (1986)............................................................................... 46, 49

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
        475 U.S. 574 (1986)..........................................................................................9

*Matter of Search Warrant Application for Geofence Location Data Stored
        at Google Concerning an Arson Investigation*,
        497 F. Supp. 3d 345 (N.D. Ill. 2020)..................................................... 30, 52

*McIver v. Bridgestone Americas, Inc.*,
        42 F.4th 398 (4th Cir. 2022) ........................................................................11

*Milligan v. City of Newport News*,
        743 F.2d 227 (4th Cir. 1984) ........................................................................53

*Monell v. New York City Dep't of Soc. Servs.*,
　436 U.S. 685 (1978)............................................................. 3, 8, 53, 54

*Pennsylvania v. Mimms*,
　434 U.S. 106 (1977).......................................................................35

*Putman v. Harris*,
　66 F.4th 181 (4th Cir. 2023)...........................................................46

*Rakas v. Illinois*,
　439 U.S. 128 (1978)............................................................... 50, 51

*Ray v. Roane*,
　948 F.3d 222 (4th Cir. 2020) .........................................................46

*Sammons v. McCarthy*,
　606 F. Supp. 3d 165 (D. Md. 2022)................................................46

*Shaw v. Stroud*,
　13 F.3d 791 (4th Cir. 1994) ...........................................................53

*Spell v. McDaniel*,
　824 F.2d 1380 (4th Cir. 1987) .......................................................53

*Stanton v. Elliott*,
　25 F.4th 227 (4th Cir. 2022) ............................................................9

*State v. Andrews*,
　227 Md. App. 350 (2016) ....................................................... *passim*

*State v. Copes*,
　454 Md. 581 (2017) .......................................................................18

*Strag v. Bd. of Trs., Craven Cmty. Coll.*,
　55 F.3d 943 (4th Cir. 1995) ................................................ 10, 11, 40, 41

*Strothers v. City of Laurel*,
　895 F.3d 317 (4th Cir. 2018) ............................................................9

*United States ex rel. Becker v. Westinghouse Savannah River Co.*,
　305 F.3d 284 (4th Cir. 2002) ................................................... 11, 40

*United States v. Blakeney*,
　949 F.3d 851 (4th Cir. 2020) ................................................ 13, 17, 34, 35

*United States v. Blauvelt*,
　638 F.3d 281 (4th Cir. 2011)..........................................................39

v

*United States v. Chatrie*,
   136 F.4th 100 (4th Cir. 2025) ...........................................................51

*United States v. Cobb*,
   970 F.3d 319 (4th Cir. 2020) ...........................................................34

*United States v. Delfino*,
   510 F.3d 468 (4th Cir. 2007) ................................................... 11, 41

*United States v. Grubbs*,
   547 U.S. 90 (2006)...........................................................................13

*United States v. Jacob*,
   657 F.2d 49 (4th Cir. 1981) ..............................................................34

*United States v. Pulley*,
   987 F.3d 370 (4th Cir. 2021) ...........................................................39

*United States v. Ramirez*,
   523 U.S. 65 (1998)..................................................................... 13, 17

*United States v. Riley*,
   858 F.3d 1012 (6th Cir. 2017) .........................................................38

*United States v. Srivastava*,
   540 F.3d 277 (4th Cir. 2008) ...........................................................17

*United States v. Ventresca*,
   380 U.S. 102 (1965).........................................................................17

*United States v. Ventura*,
   No. CRIM. WDQ-10-0770,
   2013 WL 1455278 (D. Md. Apr. 8, 2013)........................................15

*United States v. Wilford*,
   ELH-11-0258, ECF 181-1 .................................................................18

*United States v. Williams*,
   461 F.3d 441 (4th Cir. 2006) ...........................................................11

*White v. Pauly*,
   580 U.S. 73 (2017)...........................................................................46

*Zurcher v. Stanford Daily*,
   436 U.S. 547 (1978).........................................................................52

**Statutes & Other Authorities:**

U.S. Const. amend. IV ................................................................ *passim*

42 U.S.C. § 1983 ........................................................................ *passim*

33 A.L.R.7th Art. 8 (2017) ............................................................ 21, 38

Department of Justice Policy Guidance:
    *Use of Cell-Site Simulator Technology* (issued Sept. 3, 2015) .................... 48

Fed. R. Civ. Proc. 26 ......................................................................... 41

Fed. R. Civ. Proc. 56(a) ....................................................................... 9

Fed. R. Civ. Proc. 56(c) ....................................................................... 9

Maryland Rule 4-601(d) (2014) ............................................................ 37

Maryland Rule 4-601(d)(4) (2022) ........................................................ 37

Md. Code Ann. CJP § 10-4B-03 ............................................................ 38

Md. Code Ann. Crim. Proc. § 1-203.1, eff. Oct. 1, 2014 ......................... 48

## **INTRODUCTION**

For nine days after he shot three young individuals, Kerron Andrews eluded police, knowing he was wanted for triple attempted murder. While his victims—shot in the head and chest—fought for their lives in the hospital, Andrews, a confidential informant for the Baltimore Police Department, knew to avoid locations where he typically could be found.

A week after the shooting, and still having not located Andrews to serve an arrest warrant on him, officers took the reasonable steps of obtaining a court order from a neutral magistrate supported by probable cause, which granted them authority to use a cellular tracking device, also known as a cell site simulator, to obtain *real time* cell site location information for Andrews's cell phone in order to locate it, and hopefully, him with it, so they could effectuate his arrest. Ultimately, Andrews was found inside a townhome with an exterior entrance. He had with him his cell phone—the same phone used to lure the victims to the shooting location—$840, and approximately fifteen rounds of live ammunition. A gun holster and 9MM round were located outside the residence near the entrance.

After his arrest, Andrews complained that his Fourth Amendment rights were violated. The District Court granted summary judgment in favor of BPD and the officers, and Andrews appealed. This Court remanded the case for targeted factfinding regarding the cell site simulator, Hailstorm, used to locate Andrews's

1

phone. Additionally, this Court ordered the District Court to make findings as to whether BPD had any policies, practices, or procedures that prevented officers from stating to a reviewing magistrate that a cell site simulator would be used.

Discovery was conducted for nearly three years, and the parties were afforded a full and fair opportunity to gather all necessary information to answer this Court's remanded questions. Despite this, Andrews still complains he lacks information regarding Hailstorm's functionality and capabilities, including as it relates to speculative theories regarding alleged intrusions on the privacy of unknown third parties. Since such alleged infringements do not implicate Andrews's constitutional rights, they cannot stand in the way of summary judgment.

The undisputed facts, even when viewed in the light most favorable to Andrews, do not demonstrate any violation of his Fourth Amendment rights. To the extent that the use of the cell site simulator invaded any of Andrews's rights, it was his expectation of privacy in his cell phone's location. Police effectuated that location pursuant to a court order supported by probable cause that satisfied Fourth Amendment warrant requirements. On remand, summary judgment again was granted in favor of BPD and the officers. Because Andrews suffered no violation of his constitutional rights, this Court should affirm the judgment.

2

## STATEMENT OF THE ISSUES

1.  Whether the District Court properly granted summary judgment after viewing the facts in the light most favorable to Andrews, and based on the extensive factual record, held there was no genuine dispute of material fact.

2.  Whether the Officer Defendants acted reasonably when they obtained a court order supported by probable cause to use a cell site simulator/cellular tracking device with the brand name Hailstorm in a targeted, proportionate, and reasonable manner to obtain real time cell site location information?

3.  Whether the District Court abused its discretion in holding that a third-party manufacturer need not produce an additional operator's manual when Andrews failed to show that production of that manual would have generated a genuine dispute of material fact sufficient to defeat summary judgment?

4.  Whether qualified immunity bars Andrews's federal claims against the Officer Defendants because it was not clearly established in May 2014 that their specific, identified conduct violated his Fourth Amendment rights?

5.  Whether Andrews's appeal fails because he cannot maintain a § 1983 claim for alleged violations of the rights of third parties?

6.  Whether Andrews's *Monell* claim fails because there is no underlying constitutional violation and where the undisputed facts show that no BPD policy or custom caused any such violation?

3

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

Appellees, the Baltimore Police Department and former Commissioner Kevin Davis (collectively, "BPD"), and Detectives John Haley and Michael Spinnato (collectively, the "Officer Defendants"), hereby adopt and incorporate the procedural history recounted in their dispositive motions and supporting memoranda and the District Court's memoranda opinions. *See* SA0019-0044, SA0081-0084, SA0275-0312, SA0780-0805, SA0997-1017, SA1018-1047, SA1048-1547. On February 12, 2024, the District Court requested that the parties file factual briefings "outlining" Hailstorm's technology and providing, where possible, answers to the Fourth Circuit's questions and supporting facts. *Andrews v. Balt. City Police Dep't*, 1:16-cv-2010-SAG, ECF 164. Appellees subsequently filed for summary judgment (*id.*, ECF 184, 185, 195, 196), which Andrews opposed (*id.*, ECF 188, 189). On March 19, 2025, the District Court entered an indicative ruling. SA0045-0066, SA0806-0827. On April 23, 2025, this Court remanded the case back to the District Court for the limited purpose of ruling on the summary judgment motions. ECF No. 61.

On May 8, 2025, the District Court granted summary judgment. SA0019-0044, SA0780-0805. The District Court correctly held there was no genuine dispute of material fact. SA0019-0044, SA0780-0805. The District Court noted that while

4

"some of the facts in this case remain unclear," there is no genuine dispute over them. SA0024, SA0785. Any such "ambiguities" were not material to the District Court's assessment of whether the Appellees violated Andrews's constitutional rights. SA0024, SA0785.

Furthermore, the District Court declined to revisit its findings regarding Andrews's motion to compel an operator's manual not applicable to the Hailstorm[1] cell site simulator used to locate him. SA0023-0024, SA0784-0785.

## II.     FACTUAL SUMMARY

The pertinent facts of this case are exhaustively detailed in the district court record. *See* Joint Appendix (JA 1-215); Joint Supplemental Appendix (SA0001-1615); ECF 22, 26. Limited factfinding also was conducted during motions hearings in Andrews's underlying criminal case. *State v. Andrews*, 227 Md. App. 350 (2016).[2] Appellees adopt and incorporate by reference the factual recitations in those filings and their supporting exhibits. Appellees cite to these filings and the evidentiary record where necessary and appropriate.

---

[1] Hailstorm is the brand or product name of a cell site simulator manufactured by the corporation L3Harris, formerly known as Harris. SA0470, SA1108, SA1218.

[2] Appellees do not concede that *State v. Andrews*, 227 Md. App. 350 (2016), was correctly decided and reserve all rights to argue that the use of Hailstorm did not constitute a Fourth Amendment "search."

## SUMMARY OF THE ARGUMENT

Cases such as this one mandate the need to strike a balance between public safety and individual privacy. This balance, however, is subject to the Fourth Amendment's broad command of reasonableness. The Officer Defendants' actions were reasonable and appropriate under the circumstances of this case.

The undisputed facts, even when viewed in the light most favorable to Andrews, do not support any violation of his Fourth Amendment rights.[3] It is uncontested that the Officer Defendants had a valid warrant for Andrews's arrest. The Officer Defendants subsequently obtained a valid court order supported by probable cause, with targeted, proportionate, and reasonable use of a cellular tracking device or cell site simulator called Hailstorm, to obtain real time cell site location information ("CSLI") for Andrews's phone.

The parties agree on all material facts about what was done to effectuate Andrews's arrest. Two district court judges have held that the Pen Register Application and Order ("PRO") was a valid court order that met all Fourth

---

[3] At various points during the pendency of this case, and for the sake of argument, the parties have agreed to assume the location of Andrews's phone constituted a search subject to the Fourth Amendment, but this issue is still unsettled. Appellees reserve the right to contest that the location of Andrews's phone was a "search."

6

Amendment warrant requirements. No material facts exist in the record to demonstrate otherwise.

Nor is there any meaningful disagreement between the parties on the key technical capabilities of Hailstorm based on a fair reading of the voluminous factual record. Where Andrews argues that disputed facts exist, those facts are not material, not truly disputed, speculative, or misrepresented. That Andrews merely dislikes the facts because they do not support his theory of the case or a judgment in his favor is of no moment. Despite his best attempts to create phantom disputes of fact where none exist, Andrews's tortured and speculative semantical battles are unavailing. Andrews improperly seeks to engage in a review of Hailstorm in the abstract, rather than one rooted in the facts and circumstances of this case. Andrews was afforded wide latitude in conducting discovery, which yielded a vast evidentiary record that confirmed facts both sides must reasonably accept as true.

Moreover, the District Court did not abuse its discretion when it held that third-party manufacturer L3Harris need not produce an additional operator's manual when Andrews failed to show that production of that manual would have generated a genuine dispute of material fact sufficient to defeat summary judgment.

The District Court also correctly held that liability against the Officer Defendants is barred by qualified immunity.[4]

Furthermore, the District Court properly held that Andrews's 42 U.S.C. §1983 *Monell*[5] claim could not withstand summary judgment. The undisputed facts showed that, aside from a nondisclosure agreement ("NDA") between BPD and the Federal Bureau of Investigation ("FBI"), which did not prohibit officers from obtaining a warrant or court order or disclosing that they intended to use a cellular tracking device/cell site simulator to the issuing magistrate, Andrews failed to identify any other BPD policy, practice, or custom that caused his alleged constitutional deprivation.

Finally, Andrews's attempts to assert alleged constitutional violations on behalf of unknown third parties or the world at large are improper because his Complaint only brings a claim pursuant to 42 U.S.C. § 1983 for a violation of ***his*** Fourth Amendment rights. Indeed, no facts exist in the record showing the deprivation of rights of any third party, or if it possibly could be construed to be so, any such infringement was exceedingly *de minimus*. Nor does Andrews assert that any such alleged violations actually impacted any of *his* constitutional rights.

For all the foregoing reasons, summary judgment was proper.

---

[4] No allegations of negligence, gross negligence, or malice are pled in the Complaint. Thus, this Court need not consider any such claims. *See also* Section V.

[5] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 685 (1978).

**STANDARD OF REVIEW**

**I.    SUMMARY JUDGMENT STANDARD**

Appellate review of summary judgment decisions is *de novo*. *Harrell v. DeLuca*, 97 F.4th 180, 186 (4th Cir. 2024); *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *see also* Fed. R. Civ. Proc. 56(a); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). Courts in this Circuit and elsewhere apply the general principle that summary judgment is appropriate only after the opposing party has had "adequate time for discovery." *See Celotex Corp.*, 477 U.S. at 322; *see also* Fed. R. Civ. Proc. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1986).

"A fact is material when it 'might affect the outcome of the suit *under the governing law*.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248) (emphasis added). A dispute of fact is only "genuine" if a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the nonmoving party considering his burden of proof. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

"mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby, Inc.*, 477 U.S. at 247-48 (emphasis in original). While the "court must view the facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, summary judgement is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252 (internal citations and quotations omitted).

To rebut an alleged lack of evidence in the record, the nonmoving party "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). "Rather, a party opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there is a genuine issue for trial." *Id*. (internal citations and quotations omitted)*; Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); *Allstate Financial Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir. 1991). If "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby, Inc.*, 477 U.S. at 249-50 (citations omitted).

When "reviewing the grant of summary judgment [this Court] can affirm on any legal ground supported by the record and [is] not limited to the grounds relied

10

on by the district court." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 411

n.10 (4th Cir. 2022) (quoting *Jackson v. Kimel*, 992 F.2d 1318, 1322 (4th Cir. 1993)).

## II.     ABUSE OF DISCRETION STANDARD APPLIES FOR DISCOVERY DECISIONS

This Court affords substantial discretion to a district court in managing

discovery and reviews the denial or grant of a motion to compel discovery for an

abuse of discretion, which is an exceedingly high threshold. *United States ex rel.*

*Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002)

(district courts afforded wide latitude over discovery matters); *Strag*, 55 F.3d at 954

(discovery decisions should not be overturned unless clear abuse of discretion). "A

district court abuses its discretion when it acts arbitrarily or irrationally, fails to

consider judicially recognized factors constraining its exercise of discretion, relies

on erroneous factual or legal premises, or commits an error of law." *United States v.*

*Delfino*, 510 F.3d 468, 470 (4th Cir. 2007); *United States v. Williams*, 461 F.3d 441,

445 (4th Cir. 2006).

## ARGUMENT

## I.     THE DISTRICT COURT PROPERLY APPLIED THE SUMMARY JUDGMENT STANDARD WHEN IT VIEWED THE FACTS IN THE LIGHT MOST FAVORABLE TO ANDREWS

On remand, the District Court correctly held there was no genuine dispute of

material fact, even when it accepted the facts as supported by the record in the light

most favorable to Andrews, finding Appellees were entitled to judgment as a matter

of law. *See, e.g.*, SA0020, SA0023, SA0781, SA0784. Andrews was permitted wide latitude in conducting discovery, which included thousands of pages of documents propounded by Appellees and third-party manufacturer L3Harris, as well as six depositions taken by Andrews. *See, e.g.*, SA0024, SA0050, SA0785, SA1057-1059, SA1083. The key facts are known and undisputed. Andrews's protestations otherwise contradict the clear and uncontested factual record, misrepresent or misstate facts contained in the record, dismiss the District Court's considered and thorough analysis, or simply ask this Court to engage in speculation and colorable argument. This Court should affirm the District Court's ruling that Appellees are entitled to judgment as a matter of law.

### A.    The Pen Register Order and Nondisclosure Agreement

First, Andrews complains the District Court failed to view the facts in the light most favorable to him because the court found that the undisputed record did not reflect any dishonesty or concealment when the Officer Defendants obtained a PRO (JA 28-45) that did not reference Hailstorm by its brand name. Suppl. Appellant Br. at 27-29. Yet, the PRO identified the "thing[ ] to be seized," that is, Andrews's phone, stating that a cellular tracking device, also known as a cell site simulator, would be used to obtain real time CSLI, and providing descriptions of the technology to be used. JA 27-45; SA0190-0191, SA0194-0195, SA0206, SA0231-0233, SA0445, SA0510-0520, SA0529-0530, SA0642-0660, SA1077-1081.

The Constitution does **not** require search warrants to include "a specification of the precise manner in which they are to be executed." *Dalia v. United States*, 441 U.S. 238, 257 (1979). In this Circuit, "a warrant may satisfy the particularity requirement either by identifying the items to be seized by reference to a suspected criminal offense or by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize." *United States v. Blakeney*, 949 F.3d 851, 863 (4th Cir. 2020) (references to the smell of alcohol and a car accident sufficiently particular for blood draw warrant); *United States v. Grubbs*, 547 U.S. 90, 97-98 (2006). Furthermore, "the Fourth Amendment generally leaves it to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Cybernet, LLC*, 954 F.3d at 168 (cleaned up). "The key question is whether the officers' *execution* of the warrant complied with the Fourth Amendment's reasonableness requirement." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).

Here, the PRO was a valid court order that satisfied the Fourth Amendment, and to the extent that a warrant was required, served as a functional equivalent. The PRO was sufficiently particularized, and the Officer Defendants were reasonable in its execution.

The undisputed facts demonstrate that shooting detectives connected Andrews's phone to the crime based on victim statements, one of the victim's phone

13

records, and searches through BPD's internal databases. JA 28-44; SA1051-1053, and all record citations therein. Detectives further connected the phone number of the shooter to Andrews when they learned he was a registered confidential informant ("CI") and his BPD contact confirmed the number belonged to Andrews. SA0233. The PRO identified a specific telephone number, which the Officer Defendants had probable cause to believe belonged to the shooter, who had been identified in a double-blind photo array as Andrews. SA0231-0233. Based on these investigative efforts, the primary shooting detective obtained a valid arrest warrant for Andrews. SA0234. Detectives also obtained records from the phone number's telephone carrier, which not only confirmed that Andrews was the subscriber for that number, but also provided them with **the unique electronic identifier** for the target cellular device/phone.[6] SA0233. Thus, the PRO sufficiently identified and described "the thing to be seized."

---

[6] Indeed, the very nature of Hailstorm is to locate a *target device using its electronic identifier*, of which every cellular device has only one. *See, e.g.*, SA1060, and record citations therein. Once officers obtain a particular cellular device's unique electronic identifier by subpoenaing the subscriber records for a particular telephone number, they utilize a cell site simulator to locate that singular electronic identifier. For example, Lieutenant Rosenblatt testified:

> A [ROSENBLATT]: . . . It's important for you to realize that the phone number doesn't have anything to do with it. Once I've got that court order and got that specific, unique identifying – that specific device, the phone number is out of play. . . . I don't see your phone number. I don't see anything.

Although the Constitution does not require search warrants to include specifications of the precise manner in which they are to be executed, Detective Haley (the operator of Hailstorm on the day of Andrews's arrest), Lieutenant David Rosenblatt (a former longtime commander of BPD's technical support unit that utilized Hailstorm, the Advanced Technical Team ("ATT")), and Judge James Green all testified that the court is informed of the use of a cell site simulator when it reviews and signs the PRO because the order states a "cellular tracking device" will be used, a term that is synonymous to and used interchangeably with the term cell site simulator.[7] SA0187, SA0190-0191, SA0194-0195, SA0206 (Q: [Detective] Haley, on May 5th, 2014, is it your understanding that the Hailstorm device is a cellular tracking device? A: Yes.), SA0445, SA0510-0520, SA0529-0530 (Lieutenant Rosenblatt testifying he recalled using the phrases "cellular tracking

---

Q: You're just focused on the device?

A: Yes, and **the unique, specific, 15-digit number that identifies that one device in the world from any other device.** *I do not see any phone numbers of any other phones.* **Not even the phone I'm looking for.**

SA0411-0412 (emphasis added); *see also* SA1071, and record citations therein.

[7] At least one other Maryland jurisdiction has used the term cellular tracking device instead of cell site simulator in a similar PRO. *See United States v. Ventura*, No. CRIM. WDQ-10-0770, 2013 WL 1455278, at *19, 22 (D. Md. Apr. 8, 2013) (denying defendant's motion to suppress in part where the Anne Arundel Police Department obtained "trial orders . . . authorizing the installation and use of pen registers/trap & trace and cellular tracking devices).

device" to refer to Hailstorm and to cell site simulators generally and that "cellular tracking device" and "cell-site simulator" are "the same thing"), SA0642-0660, SA1077-1081.

Simply because the PRO did not include the brand name Hailstorm does not mean the type of technology was not identified. The PRO application stated, "The following information is offered in support of probable cause for the interception of *real-time cell site information.*" JA 29 (emphasis added). It further specified that "*technical devices or equipment* to accomplish the installation and use of a Pen Register \ Trap & Trace and Cellular Tracking Device, *unobtrusively and with a minimum of interference* to the service of the subscriber(s) of the aforementioned telephone, and shall initiate a signal *to determine the location of the subject's mobile device on the service provider's network . . .*" *See, e.g.*, JA 31 (emphasis added). While such extensive description of how a warrant will be executed is not constitutionally required, the PRO certainly is not deficient in this respect.

Additionally, the PRO's description of the technology to be used is consistent with the evidence adduced during discovery regarding Hailstorm's functionality and capabilities. *See, e.g.*, SA1394 (Hailstorm is ███████ and causes ██████ █████████████████████████████████, SA1416 (the Hailstorm cell site simulator is used to ███████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████, SA1257

(L3Harris's corporate designee, Stanley Gutowski, testifying: ███████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ .

No material evidence in the record supports Andrews's "conclusory" allegations" that there was dishonesty or concealment. Andrews's attempt to subject the PRO to a hyper-technical, non-common-sense review must be rejected. *Blakeney*, 949 F.3d at 862. As this Court has explained, the contents of a warrant and its supporting affidavits must be evaluated "in a commonsense and realistic fashion, eschewing technical requirements of elaborate specificity." *United States v. Srivastava*, 540 F.3d 277, 287 (4th Cir. 2008) (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).  Andrews's arguments are the opposite of a commonsense interpretation of a warrant. He relies on strained readings and "colorable" inferences that have no place in practical application. Such an approach undermines the well-settled principle that warrants are to be interpreted in a practical, straightforward manner, not dissected with undue formalism. *See Srivastava*, 540 F.3d at 289. A review through the lens of Fourth Amendment reasonableness must win the day. *See Ramirez*, 523 U.S. at 71.

Nor can Andrews create a genuine dispute of material fact merely by asserting that BPD's NDA with the FBI compelled unconstitutional conduct, particularly where the record reflects the opposite. Nothing in the NDA prohibited officers from

17

obtaining a court order or warrant or from disclosing to the issuing magistrate that a cell site simulator would be used. *See, e.g.*, SA0043, SA0804; JA 119-123; *see also* Section VII. Even assuming the NDA kept officers from disclosing the use of a cell site simulator or the precise details about the technology's operation, the Supreme Court has said there is no constitutional requirement for them to provide such detail. *See State v. Copes*, 454 Md. 581, 628 (2017) (citing *Dalia*, 441 U.S. at 257) (rejecting argument that a PRO identical to the one at issue here was defective as a warrant because it did not disclose greater detail describing the technology to be used (a cellular tracking device/cell site simulator) to execute the warrant).

Neither has Andrews shown that BPD had any policies or practices which prevented disclosure to a reviewing magistrate. *See also* Section VII. Multiple witnesses testified about BPD's practice for obtaining PROs seeking authorization to use a cell site simulator. SA0189-0190, SA0405-0406, SA0649-0652; *see also United States v. Wilford*, ELH-11-0258, ECF 181-1 ("Declaration of Lt. David Rosenblatt"); JA 135-153 (identical PRO signed by Judge Barry Willams in *Copes*, 454 Md. 581).

Indeed, Detectives Spinnato and Haley, Lieutenant Rosenblatt, and Judge Green all testified that BPD did **not** have any policies, practices, or procedures that prevented its members from stating to a reviewing magistrate that a cell site simulator would be used. SA0102-0103, SA0111-0112, SA0189-0190, SA0195-

18

0199, SA0201-0202, SA0520-0521, SA0641-0642, SA0649, SA0703-0704, SA1077-1081. Detective Haley testified that "at any time in the relevant period [he] could disclose to the reviewing magistrate that a Hailstorm device would be used." SA0202. Likewise, Lieutenant Rosenblatt testified that Baltimore City judges were advised a cell site simulator would be used when a PRO like the one in this case was presented. SA0520-0521.

Based on the undisputed facts, the District Court had no choice but to hold there was no dishonesty or concealment when Appellees presented the PRO to the reviewing magistrate. This Court should find the same.

### B.     No Genuine Disputes of Material Fact Exist Regarding Hailstorm's Technical Capabilities

On the key technical questions this Court identified, there is no meaningful disagreement between the parties. Andrews contests that the District Court did not properly apply the summary judgment standard in its consideration of certain evidence. Additionally, Andrews's claim that significant evidentiary gaps remain is unconvincing as there are no material facts related to Hailstorm's technical capabilities that are *genuinely* in dispute. While Andrews may not like the facts uncovered during discovery, they are facts nonetheless and cannot be so casually disregarded because doing so better suits his "conclusory allegations" and "mere speculation." *Dash*, 731 F.3d at 311.

19

Andrews deposed three individuals with extensive knowledge of Hailstorm's operation and technical capabilities: 1) Detective Haley, 2) Lieutenant Rosenblatt, and 3) Stanely Gutowski ("Mr. Gutowski"), the corporate designee for Hailstorm's manufacturer, L3Harris, who is a highly knowledgeable, if not the most knowledgeable, source of information about Hailstorm's functionality and capabilities. *See also* Section I.A.

The District Court's analysis demonstrates that Judge Gallagher repeatedly viewed the facts in the light most favorable to Andrews, including on all material facts, and engaged in a thorough and considered examination of those facts, *but the court was still bound by the evidence*. There is no doubt Andrews had a full and fair opportunity to gather all necessary information on the technology's operation to answer this Court's remanded questions. Even if perfect answers to the Court's questions exactly as they were phrased do not exist, sufficient information to answer them was discovered. Contrary to Andrews's assertions, the record was fully developed and sufficient for the District Court to rule on summary judgment.

Here, the parties agree on all material facts about what was done to effectuate Andrews's arrest, even though Andrews contests whether the PRO satisfied the demands of the Fourth Amendment as a matter of law. *See also* Section I.A. After over a week of Andrews eluding police, officers obtained the PRO signed by Judge Barry Williams. JA 28-44; SA0234-0235.

20

Sprint, the cell phone provider/carrier for the target phone, delivered records to ATT confirming Andrews was the subscriber of the identified number, as well as providing the **one globally unique electronic identifier** for Andrews's phone. SA0182-0184; *see also* SA1055, SA1063. Approximately "every 15 minutes," Sprint emailed ATT "the location of that handset [the target phone] with latitude and longitude coordinates *with like an uncertainty*." SA0182-0183 (emphasis added). That is, officers had to wait until Sprint provided enough information such that Hailstorm would be useful to deploy given its ████████████. *See* SA0183; *see also* SA1074-1075. Ultimately, once Sprint provided ATT with a narrower, but still approximate, location of Andrews's phone "within a range of a 200 to 1600 meter radius," officers then proceeded to that area. SA1074-1075; *Andrews*, 227 Md. App. at 359. Detective Haley explained: "We would go over to that area [provided by the phone company] and then start the Hailstorm up and it's looking for that unique serial number [globally unique electronic identifier]. Once it locks onto that on the [laptop] screen,[8] it comes up – it's like a clock." SA0183.

When turned on and not in airplane mode, cell phones will constantly seek out nearby cell towers, even if the phone is not in use. 33 A.L.R.7th Art. 8 (2017); SA1261-1262, SA1419, SA1154-1155 (Mr. Gutowski explaining that even when a

---

[8] Hailstorm itself does not have a display screen. SA1320; *see also* SA1508 ████
████████████

21

phone is turned on, but not in use ("idle"), it "is actively transmitting data back and forth to the network" of the telephone company). Once the officer arrives at the approximate area identified by the phone company, the officer inputs the target phone's 15-digit globally unique electronic identifier. SA0183. Hailstorm mimics a cell site tower, intercepting the transmissions phones are already emitting, causing some phones, which are already constantly searching for the strongest cell site tower, to view the cell site simulator as ███████ cell site tower. SA1054-1056, SA1059-1064, SA1067-1069. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

Once the target phone connects, ██████████████████████████

█████████████████████████████████████ SA1412, SA1067 ███████

████████████████████████████████████████

███████████████████████ The laptop connected to Hailstorm shows ████████

██████████████████ from the targeted device on the laptop's screen, which looks

████████████████████. SA1069, SA1399-1401; *Andrews*, 227 Md. App. at 364.

22

Officers can then start navigating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SA1083-1084.[9]

Once officers have narrowed the target phone's general direction based on

▮▮▮▮▮▮▮▮ as much as they "c[an] from inside . . . the truck" where Hailstorm is

installed, they then can exit the vehicle and use a handheld directional finder that is

radio frequency detector, which officers can tune to the frequency on which the

target phone is transmitting. SA1055, SA1062. That directional finder is not part of

Hailstorm but can be used in addition to Hailstorm to more precisely narrow from

*where the target phone's signal is emitting*. SA1062. The radio frequency detector

is only a "hot or cold meter" (SA0472-0477, SA1069), somewhat akin in functioning

to a metal detector. The radio frequency detector and Hailstorm do not communicate

with each other. SA1062. Thus, there is no interaction with non-target phones once

the officers begin using the radio frequency detector.

With that factual context in mind, Appellees now turn to Andrews's claims

that the District Court misapplied the summary judgment standard. First, Andrews

claims the District Court ignored ▮▮▮▮▮▮▮▮▮ Hailstorm's range is, even though

Andrews does not dispute it ▮▮▮▮▮▮▮▮ Suppl. Appellant Br. at 19, 29. The

---

[9] BPD's Hailstorm was physically installed in a vehicle and was not man-portable, meaning officers could not, as Andrews's claims, "walk[ ] the street with HAILSTORM in hand searching each cell phone in each home" (SA0842)). SA1062.

evidence regarding Hailstorm's "maximum range" and the ██████ that might affect it, as well as the Court's analysis of this remanded question, is robust. *See, e.g.*, SA0025-0026, SA0786-0787, SA1062-1063, SA1067-1069. The Court correctly concluded that, based on the undisputed evidence, ████████████ ████████████████████████████████████████████████████████ ████████████████████ SA0026, SA0787, and record citations therein. Ironically, the undisputed evidence revealed that ████████████ of Hailstorm's range actually worked against law enforcement, meaning that factors they could not control typically ████████████████████████████████████ including in ████████████████. The parties agree Andrews's phone was located ████████ ████████; the District Court's analysis was reasonable and accurate.

Andrews next quibbles with Judge Gallagher's analysis of the maximum number of devices that can connect to Hailstorm, stating she "inexplicitly speculated" that Hailstorm could connect to twenty-five percent of devices within its range. Suppl. Appellant's Br. at 29, 36. He cites this as an example that Judge Gallager did not view the facts in the light most favorable to him. *Id*. Judge Gallagher acknowledged she lacked some context here (SA0789) but correctly reasoned there was no exact answer to this remanded question (SA0789) as phrased. This is because, as the extensive evidentiary record indicates, Hailstorm's range ████████ ████████████████████████████████████████████████████████

24



Although Andrews complains that Judge Gallagher's reasoning was speculative, the court is permitted to review and synthesize the facts in the record in order to apply the law. Judge Gallagher analyzed all the facts and drew reasonable inferences (where necessary) and conclusions. In fact, Judge Gallagher actually viewed the facts extraordinarily in Andrews's favor here because she hypothesized that Hailstorm could conceivably connect to *all* of Sprint's customers within Hailstorm's range, which might constitute roughly a quarter of the phones (given Sprint's approximate market share at the time) in Hailstorm's ███ range (SA0026-0027, SA0787-0788), even though this appeared highly unlikely given the

25

undisputed evidence ██████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ This was

a strong presumption in Andrews's favor, but it cannot be said that Judge Gallagher's

attempts to synthesize a large record of nuanced technical evidence was improper.

Andrews also claims that questions remain regarding data access and storage

and speculates that an additional operator's manual is therefore needed. Suppl.

Appellant Br. 37; *see also* Section III. However, ample evidence exists in the record

answering both these questions, which the District Court considered in rendering its

summary judgment decision. *See, e.g.*, SA0789, SA0831-0833, SA1007-1008,

SA1026-1028, SA1073-1074; *Andrews*, 227 Md. App. 350; *see also* Section III.

Regarding data collection, Andrews claims Judge Gallagher ignored the

"fact" that "Hailstorm collects cell phone ████████." Suppl. Appellant Br. at 29, 37.

But this "fact" is incorrect. Hailstorm does not collect a phone's ████████ It

████████████████████████████████. SA0183, SA0477 ████████████████

███████████████████████████ SA1274-1275, SA1412 ████

█████████████████████████████████████████████████

██ Officers can then navigate in that signal's direction, and they can further narrow

down the direction using a handheld radio frequency/"hot or cold meter," which does

not communicate with Hailstorm, and thus make a judgment as to where the phone may be located. SA0472-0477, SA1055, SA1062.

Judge Gallagher correctly understood the material facts here, even though she, at times, mistakenly equated this to ▮▮▮▮▮ when it is really ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although the District Court also did mistakenly state that Hailstorm stores ▮▮▮▮▮ Judge Gallagher's citation to the factual record was correct: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SA0789 (citing Deposition of Stanley Gutowski (SA1320)). Even though the court made a minor error here, the factual record is clear, and Andrews is fully aware of what that record is. He cannot convert a slight error into a disputed material fact, especially when the actual facts are undisputed.

Andrews also argues that Hailstorm ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮[10] and that Judge Gallagher discounted this. Suppl. Appellant Br. at 21,

---

[10] At times, Andrews seems to suggest that Hailstorm ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Suppl. Appellant Br. at 37. This is incorrect. While there are several *types* of global electronic identifiers, the type (e.g., IMSI, IMEI, TMSI, ESNs, MSID) depends on the technology utilized by the particular device (e.g., GSM, UMTS, LTE) and some of the technologies are more outdated or out of use than others, as are their electronic identifiers. SA1060-1061; *see also generally* SA0364-0569, SA1086-1489. But each device has only *one*, unique 15-digit global identifier. SA1060-1061. The 15-digit electronic identifier is a meaningless string of numbers without anything with which to connect it. *See, e.g.*, SA0411, SA1387-1389.

29-30, 37-38, 40. The District Court's opinion and reasoning show otherwise, and importantly, they are supported by the undisputed evidentiary record on all material facts. SA0011, SA0029, SA1387-1389. By default, the laptop attached to Hailstorm

███████████████████████████████████████████████████████

████████████████████████████████████████ SA1133, SA1261-1262, SA1280, SA1313, SA1317-1318. L3Harris trains its customers ███

██████████████████████████████████████ SA1263-1265.

███████████████████████████████████████████████

██████████████████████████████ and those electronic identifiers are completely meaningless on their own. *See, e.g.*, SA0411, SA1387-1389. Detective Haley, who operated Hailstorm on the day of Andrews's arrest, testified he purged Hailstorm *every day* and never backed up the device or stored anything elsewhere. SA0174.

Andrews engages in lengthy speculative and hypothetical scenarios about what *could* happen. Suppl. Appellant Br. at 21, 29-30, 37-38, 40. For example, he argues the District Court ignored the fact that ████████████████████

██████████████████████████████████████████████████████

████████████████████████████ *Id*. at 22. But, again, that information would be meaningless. *See, e.g.*, SA0411. There are no material facts in the record that demonstrate that any of Andrews's speculative scenarios occurred in this case. The District Court was obligated to consider the factual record *in this case*, not follow

28

Andrews through an endless maze of theoretical exercises, "building [ ] one inference upon another." *Dash*, 731 F.3d at 311.

Concerningly, Andrews goes on to misrepresent the testimony and evidence, stating, "The court . . . wholly ignored that [Hailstorm] . . . ███████████████ ████████████████████████████████████████████████" Suppl. Appellant Br. 37. This is untrue. There is no evidence Hailstorm ████████ ████████████████████████████████████████████████████ ████████████████████████████ SA1063. ████████████████████ ████████████████████████████████████████ SA1257-1259. Nor would it make sense for Hailstorm to █████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████ SA1065-1066. ███████████████████████████ ████████████████████████████████████████████████████ ████████ SA1066. Andrews's claim that ███████████████████████

29

█████████████████████████████████ is highly exaggerated and misleading.

*See also* Section VI; *Matter of Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 362 (N.D. Ill. 2020) ("The proper line of inquiry is not whether a search of location data could impact even one uninvolved person's privacy interest, but rather the reasonableness of the search . . ."). That a third party's interests ███████████ ███████ does not constitute a constitutional infringement, and there is no evidence in the record that this occurred. *Id.*; SA0034, SA0795.

Even with respect to target devices/phones, Hailstorm: ██████████



███████████████████████████████████ SA1064-1065; *see also Andrews*, 227 Md. App. at 364.[11] Thus, Andrews's allegation that ██████████████ ███████████ significantly misrepresents the evidence.

---

[11] It is undisputed that Hailstorm does not access, collect, or store *any* content (such as metadata, numbers dialed, the content of voice or video calls, a record of text messages or their content, a record of web pages visited, the content of emails, any application data about cellular device operations, photographs stored on phones, telephone numbers, or any content stored on a phone) for a target *or* non-targeted device. SA0788, SA1071-1074.

Furthermore, Andrews claims "[t]he District Court entirely overlooked that Mr. Gutowski admitted that the [additional] manual would likely contain information regarding data logging preferences and their configurations, information directly responsive to this Court's remand order." Suppl. Appellant Br. at 35. However, Andrews cites only to two pages of Mr. Gutowski's over three-hundred-page deposition (*id.* (citing only "SA1346")) to make this argument. Andrews fails to acknowledge that this line of questioning began pages earlier when his counsel questioned Mr. Gutowski in detail about information contained in the Hailstorm Startup Guide (SA1545-1546), which *was* produced in discovery, and that questioning on the topics of logging preferences, configurations, and registration continued for many pages afterward. SA1340-1371. Andrews had sufficient opportunity to discover the material facts; that those material facts do not support his theory of the case is unpersuasive.

Andrews also claims Mr. Gutowski "admitted" Hailstorm ███████████████ ████████████████████████████ Suppl. Appellant Br. at 37 (purportedly quoting SA1242, SA1368) (emphasis added). It is unclear to what Andrews is referring and quoting as the word ██████ does not appear on those pages of Mr. Gutowski's deposition. Regardless, even if we accept that Mr. Gutowski agreed at some point

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ already discussed *supra*, ████████████████████

31

███████████████████████████████████████████████

Andrews takes Mr. Gutowski's testimony out of context or cherry picks isolated words from the record, which could serve to mislead this Court. There is no evidence the District Court "ignored" this testimony or any testimony or evidence.

Next, and somewhat relatedly, Andrews claims the District Court ignored Mr. Gutowski's purported testimony that "Hailstorm's settings can be modified to display and store ███████████████████████" Suppl. Appellant Br. 37 (emphasis in original). Mr. Gutowski actually testified as follows: ████████

███████████████████████████████████████████████

███████████████████████████ SA1262. And, earlier in his deposition, Mr. Gutowski testified that the claim that Hailstorm ███████████████████████

████████████████████████████████████ was inaccurate.

SA1257-1259 ███████████████████████████████████

██████████████████████; *see also* SA1365 ████████████████████

███████████████████████████████████, SA1367-1368 ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ (emphasis added), SA1367 ████████

████████████████████████████████████

███

In sum, Andrews cannot generate genuine disputes of material fact by taking evidence out of context and engaging in endless speculative and semantical battles. This Court's remanded questions yielded targeted, but robust discovery confirming material facts both sides must accept. No material facts regarding Hailstorm's technical capabilities were genuinely disputed. Andrews's disagreement is with the legal conclusions, not the factual findings.

## II. THE PEN REGISTER ORDER WAS A VALID COURT ORDER THAT SATISFIED FOURTH AMENDMENT WARRANT REQUIREMENTS

Andrews asserts that the PRO did not satisfy Fourth Amendment warrant requirements. This issue, too, has been briefed at length.[12] *See, e.g.*, ECF No. 22; JA 46-74, JA 103-134, JA 160-181, JA 184-215; SA0019-0044, SA0067-0075, SA0780-0805, SA0828-0836, SA0997-1047; *see also* Section I.A. Over six years ago, the District Court held the PRO met Fourth Amendment warrant requirements (JA 162-181); nothing in the remand record militates altering this conclusion. Indeed, Judge Gallagher also concluded that the PRO satisfied the Fourth Amendment. *See* SA0019-0044, SA0780-0805.

---

[12] Again, Appellees will not repeat the extensive prior briefings and District Court's reasoning but rather adopt and incorporate them by reference. Appellees cite to them as appropriate.

33

Furthermore, the District Court also has twice held that the Officer Defendants' execution of the order was reasonable. *See* JA 162-181; SA0019-0044, SA0780-0805. Yet Andrews continues to challenge the PRO on multiple bases, including some that have never been raised until now (and thus are waived). This Court should reject Andrews's arguments because the PRO served as a valid court order supported by probable cause, was sufficiently particular, and was reasonably executed under the circumstances of this case. Thus, it was a warrant, even though there was no "clearly established" law mandating that a warrant was required at the time.

When law enforcement acts pursuant to a validly issued search warrant, or the functional equivalent of one, their actions "carry a presumption of legality." *See Anglin v. Dir., Patuxent Inst.*, 439 F.2d 1342, 1346 (4th Cir. 1971). Search warrants should be construed "in a commonsense and realistic manner, avoiding a hypertechnical reading of their terms." *Blakeney*, 949 F.3d at 862 (cleaned up). The test "for the necessary particularity is a pragmatic one" and "[t]he degree of specificity required . . . may necessarily vary according to the circumstances and type of items involved." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020) (quoting *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981)).

The Constitution does not require search warrants to include "a specification of the precise manner in which they are to be executed." *Dalia*, 441 U.S. at 257;

34

*Blakeney*, 949 F.3d at 863. "[T]he Fourth Amendment generally leaves it to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Cybernet, LLC*, 954 F.3d at 168 (cleaned up).

The ultimate touchstone of the Fourth Amendment is reasonableness, which depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Garrett v. Clarke*, 74 F.4th 579, 584-85 (4th Cir. 2023). Reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). "In the execution context, as elsewhere, Fourth Amendment reasonableness kicks in." *Cybernet, LLC*, 954 F.3d at 168.

Appellees already have described in great detail the probable cause for the PRO and its particularity with respect to the item to be "seized," that is, Andrews's cellular phone. *See* Section I.A. The language of the PRO regarding Andrews's cellular phone was "carefully tailored" and sufficiently particularized, and thus more than sufficient to meet the demands of the Fourth Amendment. *Id.*

Andrew also complains that the PRO did not "describe with particularity the apartment located at 5032 Clifton Ave as the place to be searched."[13] Suppl.

_____

[13] Detective Haley testified that 5032 Clifton Avenue was a townhome. SA0185. It had an exterior entrance. SA0236.

35

Appellant Br. at 51-56. Appellees do not concede that 5032 Clifton Avenue was searched at all during the use of Hailstorm. Additionally, in light of the extensive evidentiary record, Andrews's argument defies common sense. It is undisputed Appellees did not know where to find Andrews. *See generally* SA0225-0236. Had they known where he was, they could have taken him into custody immediately because they had a valid warrant for his arrest. SA0234. The entire purpose of obtaining the PRO to use a cell site simulator was to locate Andrews's phone because they hoped his phone would be with him and thus that they could effectuate his arrest *because they did not know where he was or reasonably might be*.

It also is undisputed that Andrews was a CI (SA0231-SA0233); thus, he was aware of police tactics and likely knew he would quickly be located at any locations he might normally frequent.[14] Andrews clearly did not intend to be caught; despite BPD's knowledge about him due to his status as a CI, he still eluded police for nine days after shooting three people. When he was arrested, he was found with a gun, a significant amount of cash, and approximately fifteen rounds of live ammunition. SA0236. A gun holster and 9MM round were located immediately outside the exterior entrance of 5032 Clifton Avenue (SA0236), suggesting Andrews might even have seen police in the area and actively fled. If Appellees had known a

---

[14] Indeed, any suspect in a violent crime might reasonably surmise this, but here, it was particularly so given Andrews's specific connection to BPD.

36

physical address where Andrews reasonably could have been located, we would not be here today. To demand this is tantamount to demanding police possess the power of clairvoyance. Thankfully, the Fourth Amendment merely requires reasonableness and common sense.

Next, Andrews complains the PRO was not reasonable because it was not "valid for only fifteen days from the date of issuance." Suppl. Appellant Br. at 42. This argument has never previously been raised and thus is waived. Should this Court decide to consider it, however, it is unavailing. Andrews purports to cite as a basis for this requirement Maryland Rule 4-601(d) (2014). *Id*. The plain language of Md. R. 4-601(d) included in Andrews's supplemental brief does not state this. *Id*. at 80-81. Indeed, the only similar reference Appellees could locate was in the statute's current version (2022), which merely states that *after execution* of a sealed warrant, a copy should be left with the person from whom property was seized within fifteen days, if a copy had not been provided previously. Md. R. 4-601(d)(4) (2022). It is unclear to what Andrews refers, but his argument is unpersuasive regardless.

To be sure, a court order or warrant should be reasonably limited in its temporal and geographic scope. But, again, the PRO must be viewed in light of the undisputed factual circumstances of this case. Andrews, a registered CI, was aware BPD had superior knowledge about his typical whereabouts and eluded police for nine days after a violent crime. The temporal (sixty days) and geographic scope of

37

the PRO was thus reasonable under the circumstances. It was possible Andrews had fled the city, or even the state. And, Andrews could have continued to evade detection, even with the use of a cellular tracking device/cell site simulator, by turning off his phone ███████████████████, making him even more difficult to track, especially if he—intermittently or for lengthy periods—stopped his phone from emitting a signal. SA1261-1262, SA1419 (Mr. Gutowski testifying that a user can prevent his or her cellular device from connecting to the network (or to a cell site simulator) by turning it off ███████████████); 33 A.L.R.7th Art. 8 (2017) (when turned on, cell phones will constantly seek out nearby cell towers, even if the phone is not in use); *United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) (observing that "had Riley truly wished to avoid detection, he could have chosen not to carry a cell phone at all, or to *turn it off*.") (emphasis in original). The PRO was reasonable under the circumstances.

Andrews also argues that PROs "cannot authorize obtaining location information or seizing phones." Suppl. Appellant Br. at 43 (relying on Md. Code Ann. CJP § 10-4B-03). However, the Officer Defendants reasonably tried to obtain a court order supported by probable cause under a statute they knew to be related to electronic communications and devices. *See* Section I.B. This does not automatically constitute deceit or concealment or render the order unconstitutional when it was otherwise particularized and reasonable.

In further support of his argument that the Officer Defendants must have been deliberately dishonest, Andrews asserts that because Detective Spinnato (from BPD's Warrant Apprehension Task Force unit) testified he did not know what Hailstorm was, the Appellees must have intended to be deceitful or conceal the use of a cell site simulator. Suppl. Appellant Brief at 43-44. Under the collective knowledge doctrine, Detective Spinnato did not need to know all the facts, including how the location of Andrews's phone would occur. *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021) (quoting *United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011) (internal citation omitted) (finding "when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause[ ] [t]he knowledge is imputed from one officer to another."). Detective Spinnato's role was to undertake investigative efforts into the suspect's background and ultimately effectuate an arrest. SA0097, SA0114-0116. He testified he drafted only the probable cause portion of the PRO based on the facts of the crime and his knowledge of Andrews's evasion. SA0101. He was permitted to reasonably rely on the knowledge of other officers, such as ATT and the detectives investigating the attempted murders, in addition to his own investigative efforts, in drafting the PRO's probable cause statement. SA0101, SA0225-0233. Detective Spinnato also testified he had no knowledge of the NDA and was not aware of any BPD policy or practice preventing him from disclosing to a judge that a cell site simulator would be used. SA0099, SA0111-0112.

39

Thus, the District Court correctly decided that the PRO satisfied the demands of the Fourth Amendment. So, too, should this Court.

### III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING A MOTION TO COMPEL AN ADDITIONAL OPERATOR'S MANUAL

Andrews engages in a tortured and speculative battle of semantics to try to convince this Court that the denial of his motion to compel production of an additional operator's manual from L3Harris was an abuse of discretion. *See* Suppl. Appellant Br. at 19-39. In reality, comprehensive documentary and testamentary evidence was adduced at the district court level. *See, e.g.*, SA0146-0222, SA0364-0744, SA1048-1546. More importantly, Andrews conducted an extensive deposition of Mr. Gutowski, who has served as a test engineer, systems engineer, and product manager for L3Harris, and Hailstorm's living, breathing operator's manual. SA1087-SA1489.

Simply put, the District Court did not abuse its discretion when it denied the motion to compel where Andrews fails to identify specific, ***material*** facts that the operator's manual at issue would contain—*that are not already in the record* and that impact *his* rights—such that a genuine dispute exists sufficient to defeat summary judgment. *See also* Section I.B.

Substantial deference is afforded to the district court in its management of discovery. *Westinghouse Savannah River Co.*, 305 F.3d at 290; *Strag*, 55 F.3d at

40

954. Federal Rule of Civil Procedure 26 does not permit endless discovery, and it was within the purview of the district court to marshal the scope and manner of discovery. Abuse of discretion is a very high threshold and generally should be found to have occurred only if a district court "acts arbitrarily or irrationally." *Delfino*, 510 F.3d at 470. The nonmoving party must show the evidence sought would have created a genuine issue of material fact sufficient to defeat summary judgment and put forth *specific* facts evidencing that a genuine issue exists. *Strag*, 55 F.3d at 953; *see also Allstate Financial Corp.*, 934 F.2d at 58.

On October 29, 2020, Andrews issued a subpoena to L3Harris that requested "user manuals for 'the device used to locate Andrews.'" SA0362. L3Harris produced a Hailstorm Startup Guide (SA1545-1546), a fifty-three-page Gemini Mode Quick Start Guide[15] dated July 29, 2013 (SA1491-1543), and a Federal Communications Commission ("FCC") briefing dated October 7, 2014 (*see, e.g.*, SA1229-1304), among other documents (*see, e.g.*, documents referenced in SA1087-1489).

During Mr. Gutowski's over seven-hour deposition on May 24, 2022, the parties questioned him about the L3Harris production, including manuals, and Hailstorm's technical capabilities, including this Court's remanded questions. *See* SA1087-1489. Mr. Gutowski testified that the Gemini Mode Quick Start Guide was a type of user's manual for Hailstorm. SA1164. It was provided to BPD between

---

[15] Gemini is the software used with Hailstorm. SA1189-1190.

41

approximately late 2013 to early 2014. SA1166. He testified it was the manual for the device used to locate Andrews, which was identified by a part number and FCC ID. SA0362, SA1164-1167.

Mr. Gutowski further testified that another operator's manual, *one which was never provided to BPD or any U.S. local law enforcement*, was not produced in response to the specific October 29, 2020, document subpoena Andrews served on L3Harris, because it was not responsive to the subpoena. SA0362-0363, SA1164-1167. Throughout Mr. Gutowksi's deposition, counsel for L3Harris raised objections and asserted legal defenses, including privilege and confidentiality, where necessary. A discussion regarding privilege occurred specifically related to the additional manual. SA0362-0363, SA1164-1166. Notably, a stipulated protective/confidentiality order previously had been entered on January 25, 2021, so Andrews was well aware that L3Harris was asserting various defenses and privileges, including protection of materials as confidential and export controlled. *See Andrews*, 1:16-cv-2010-SAG, ECF 107. Counsel for Andrews did not pursue a discovery dispute with the court regarding the additional operator's manual on the day of the deposition. Counsel for L3Harris served the parties with a notice of Deposition Transcript and Exhibit Designations on July 7, 2022, which stated that "[p]ortions of the deposition transcript [of Mr. Gutowski] contain Confidential and

42

Export Controlled material as defined in the Stipulated Protective Order." *Id.*, ECF 170-6 at 2-6.

Throughout the pendency of the case and discovery, the District Court, parties, and where necessary, third-party L3Harris, regularly conferred. *See generally id.*, ECF Dkt. (reflecting parties filed over ten joint status reports during the litigation). Andrews did not raise the issue of the additional operator's manual with the court until April 3, 2023 (nearly a year after Mr. Gutowski's deposition) and did so only in a preliminary manner at that time. *Id.*, ECF 143. Over six months later, on September 28, 2023, counsel for Andrews filed a letter with the court advising of a discovery dispute about the additional manual. *Id.*, ECF 152. This filing attached[16] a letter from L3Harris and a Declaration from Mr. Gutowski, in which he stated:

> The additional Hailstorm manual I referenced in my deposition is not for 'the device used to locate Andrews' or for any device or software ever sold to the Baltimore City Police Department. It is not applicable to Hailstorm used by the Baltimore City Police Department or any U.S. local law enforcement. It discusses different Hailstorm capabilities and functionality not available to any state and local law enforcement customers. L3Harris considers this document sensitive and highly confidential.

SA0360-0363.

---

[16] An attached certificate of compliance indicated Andrews's counsel did not meet and confer with L3Harris until February 2023, approximately eleven months after the deposition. *Andrews*, 1:16-cv-2010-SAG, ECF 152-1.

On October 5, 2023, the District Court held a conference call and ruled that L3Harris need not produce the additional "Hailstorm manual [Mr. Gutowski] referenced in his deposition [because it] is not applicable to the Hailstorm device used by the Baltimore City Police department or any U.S. local law enforcement." SA0347. After nearly three years of discovery, the District Court carefully considered the arguments from the parties and L3Harris. L3Harris argued that applicable manuals and guides had already been produced and that the additional manual contained information it considers proprietary and confidential. SA0347, SA0360-0363. The District Court found that Andrews only "speculat[ed] that there might be something helpful in the Hailstorm manual referenced by Mr. Gutowski," but this was not enough to compel production. SA0347. Although Andrews now complains the District Court did not conduct an *in camera* review of the additional manual, Andrews did not request that the court do so. SA0348-0359. Ultimately, the District Court ruled that production was not proportional to the needs of the case because the additional operator's manual was unrelated to this case, never available to or used by BPD, and was "not applicable to the Hailstorm used by BPD." SA0347. The District Court's ruling was considered, well-reasoned, and proportional to the

44

needs of the case. Andrews fails to point to any arbitrary or irrational decision making, or any other error, supporting an abuse of discretion.[17]

Andrews purports to lay out numerous disputed material facts or material gaps in the evidentiary record as bases for why the District Court abused its discretion or failed to properly apply the summary judgment standard (Suppl. Appellants Br. at 25, 30-39), which Appellees address more fully *supra* in Section I.B. There is no doubt Andrews had a full and fair opportunity to gather all necessary information on the technology's operation and capabilities. Even if precise answers to this Court's questions exactly as they were phrased do not exist, sufficient information was discovered to answer the remanded questions to support a ruling on summary judgment. Moreover, Andrews fails to show that the additional manual contains any unique, material information not already obtained in discovery, particularly as it relates to any implication of *his* rights.

This Court should affirm the District Court's denial of Andrews's motion to compel as there was no abuse of discretion.

---

[17] Andrews also cites unrelated testimony of Lieutenant Rosenblatt. Suppl. Appellant Br. at 17. But counsel for Andrews asked Lieutenant Rosenblatt about manuals for "these devices," that is, cell site simulators generally. *See* SA1082-1083, and record citations therein. The time period referenced was 2001. *Id*. Hailstorm did not exist in 2001, and BPD did not obtain Hailstorm until approximately late 2013. SA0424-0428 (discussing invoices to BPD for Hailstorm's purchase), SA1082-1083, SA1120 (Mr. Gutowski testifying that Hailstorm was first released around 2012), SA1166. This does not amount to even a "scintilla of evidence.

## IV.    QUALIFIED IMMUNITY

The issue of qualified immunity was thoroughly briefed at the trial level. Appellees adopt and incorporate by reference the Officer Defendants' legal briefings and arguments contained therein, as well as the District Court's findings, and cite to them as necessary. *See* SA0040-0042, SA0067-0075, SA0837-0996, SA1020-1047.

Whether officers are entitled to qualified immunity presents a question of law an appellate court reviews *de novo*, "accepting the facts as the district court viewed them." *Putman v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023). The Supreme Court recognizes that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity ensures officers are held personally liable "only for 'transgressing bright lines.'" *Gomez*, 296 F.3d at 261 (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

"Qualified immunity turns on the 'objective reasonableness of an official's conduct, as measured by reference to clearly established law.'" *Sammons v. McCarthy*, 606 F. Supp. 3d 165, 200 (D. Md. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case." *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020) (citing *White v. Pauly*, 580 U.S. 73, 80 (2017)).

46

Instead, courts must "examine the alleged right at a 'high level of particularity.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 251(4th Cir. 1999).

Andrews's argument that the District Court erred in "framing" the qualified immunity analysis lacks merit. Suppl. Appellant Br. 63-65. He contends the District Court should have recognized the "correct" issue as whether the officers violated a clearly established right by failing to specifically inform the PRO judge of their intention to use a cell site simulator. *Id.* That contention fails for reasons stated repeatedly throughout this litigation: Supreme Court precedent does not require officers to specify the precise manner in which a valid warrant will be executed. *See Dalia*, 441 U.S. at 257. The District Court properly framed the qualified immunity inquiry as whether the right at issue was the right to be free from a warrantless search by a cell site simulator (SA0041, SA0802), and Andrews's contrary assertion should be rejected.

The use of a cell site simulator on May 5, 2014, without a warrant, did not, as the undisputed facts demonstrate, violate a "clearly established" constitutional right. SA0041, SA0802. At the time of Andrews's arrest, the federal courts were—and very much remain today—unsettled on the Fourth Amendment implications of the collection of real time CSLI. In 2014, the Supreme Court had not yet addressed whether there is a reasonable expectation of privacy in real time CSLI. *See Carpenter v. United States*, 585 U.S. 296 (2018) (Supreme Court addressing only

47

historical CSLI and expressly declining to address the use of real time CSLI); *see id.* at 316 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time CSLI . . ."). Nor had the United States Court of Appeals for the Fourth Circuit addressed the use of real time CSLI in May 2014.

Moreover, even advisory guidance did not put officers "on notice." Andrews and courts have oft-cited policy guidance from the Department of Justice ("DOJ"). *See, e.g.*, ECF No. 49; SA0846, SA0951. But this *updated* policy guidance was issued on September 3, 2015, nearly sixteen months *after* Andrews's arrest. *See* Department of Justice Policy Guidance: *Use of Cell-Site Simulator Technology* (issued Sept. 3, 2015) found at https://www.justice.gov/d9/ pressreleases/attachments/2015/09/03/doj_cellsite_simulator_policy_9-3-15.pdf; *see also* ECF No. 49; SA0846, SA0951. The plain language of the policy guidance acknowledges that, prior to September 2015, DOJ took the view that only a pen register order was needed. ECF No. 49 at 3 ("While the Department has, in the past, appropriately obtained authorization to use a cell-site simulator by seeking an order pursuant to the Pen Register Statute, as a matter of policy, law enforcement agencies must now obtain a search warrant supported by probable cause . . .").[18]

---

[18] By the time DOJ issued this advisory guidance, a new state law had gone into effect. *See* Md. Code Ann., Crim. Proc. § 1-203.1, eff. Oct. 1, 2014.

At the time of Andrews's arrest on May 5, 2014, there simply was no binding legal authority requiring a warrant to utilize a cell site simulator to obtain real time CSLI. SA0041. Here, the Officer Defendants obtained approval from a neutral magistrate and had every *indicia* that what they were doing was lawful. *Malley v. Briggs*, 475 U.S. 335, 341 (1987) (officers acting pursuant to a warrant are immune from liability unless no reasonable officer could have believed there was probable cause to support the application).

Andrews's reliance on *Kyllo v. United States*, 533 U.S. 27 (2001), to argue that the officers were on notice that their conduct violated clearly established law is misplaced. *Kyllo* held that when law enforcement uses a device not in general public use to explore intimate details of a private home that would otherwise have been unknowable without physical intrusion, the surveillance is a Fourth Amendment search. *Id*. at 40. But the right at issue here is fundamentally different. The relevant question is whether a person has a constitutional right to be free from warrantless real time tracking by a cell site simulator, regardless of whether that person is inside a dwelling, out in public, or elsewhere. *Kyllo* simply did not address that right. To extend *Kyllo* to these facts would impermissibly define the right at an unduly high level of generality—precisely what the Supreme Court has cautioned against. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

There simply is no evidence the Officer Defendants transgressed any "bright lines." *Maciariello*, 973 F.2d at 298. Thus, this Court should find that qualified immunity bars Andrews's claim.

## V.    PUBLIC OFFICIAL IMMUNITY

No allegations of negligence, gross negligence, or malice are pled in the Complaint (JA 12-26), which has never been amended (SA0001-0018). Thus, such allegations should not be considered, nor is any ruling on public official immunity necessary. To the extent this Court will consider such claims, they are barred by the public official immunity doctrine. *See* SA0042, SA0803, SA1020-1047.

## VI.   ANDREWS'S APPEAL FAILS BECAUSE HE CANNOT MAINTAIN A § 1983 CLAIM FOR ALLEGED VIOLATIONS OF THIRD PARTIES' RIGHTS

The question in a §1983 suit for a Fourth Amendment violation is "not whether the officer acted reasonably vis-a-vis the world at large," but "whether the officer acted reasonably *as against the plaintiff*." *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000) (citing *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990)) (emphasis in original). The Fourth Amendment does not provide rights to individuals based on the unauthorized search of a third party's property. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

Many of Andrews's complaints focus not on actions taken against him personally, but on potential actions against unknown third parties. *See, e.g.*, Suppl.

50

Appellant Br. at 53. Specifically, Andrews broadly claims that officers "searched" every home in the 5000 block of Clifton Avenue. *Id*. There is no evidentiary basis for this but even if there were, Andrews has never alleged, nor can he, that Hailstorm's possible interaction with other phones caused *him* any injury. Nor has he claimed that the government used, or even attempted to use, information related to other phones against him in his criminal prosecution. Most importantly, Andrews cannot show he has any reasonable expectation of privacy in Hailstorm's alleged interaction with, or information collection from, unknown third parties. *See Rakas*, 439 U.S. at 134. Therefore, Andrews cannot show any influence on or connection to *his* alleged constitutional injury.

Nor has Andrews shown that the rights of any third parties actually were infringed upon or violated. The District Court correctly found, based on the record, that no third-party rights were implicated in this case. SA0034, SA0795. This Court's recent *en banc* review in *United States v. Chatrie* supports the District Court's finding on this same point: individuals "lack a reasonable expectation of privacy in data that is truly anonymous, meaning that—as evaluated at the time of the government's request—the data is not likely to be traceable to specific individuals." 136 F.4th 100, 144 (4th Cir. 2025) (Berner, J., concurring). Hailstorm's potentially fleeting interactions with the meaningless electronic identifiers of third parties fall into the same category. Even assuming some third-parties' privacy

interests were incidentally affected, that would not violate the Fourth Amendment, which recognizes that "constitutionally permissible searches may infringe on the privacy interests of third persons—that is, persons who are not suspected of engaging in criminal activity." *In re Search of Info. Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 82 (D.D.C. 2021) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 550 (1978)).  This principle is hardly novel. What matters is not whether some uninvolved person's privacy interests are touched, but whether the search itself was reasonable, supported by probable cause, and executed with particularity. *See Matter of Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d at 362 ("The proper line of inquiry is not whether a search of location data could impact even one uninvolved person's privacy interest, but rather the reasonableness of the search, the probability of finding evidence at the location, and the particularity of the search request."). Here, the PRO satisfied all those requirements. *See* Sections I.A., I.B.

On this record, because the officers acted under a valid order supported by probable cause, or the functional equivalent of a warrant, their conduct was reasonable, and any incidental interference with third parties—which was fleeting, minimal, and constitutionally permissible—does not alter that conclusion. Thus, to the extent Andrews seeks to impose liability for hypothetical or incidental searches of third parties, his § 1983 claim fails as a matter of law.

52

## VII.  ANDREWS'S *MONELL* CLAIM FAILS AS A MATTER OF LAW

The District Court properly held that the undisputed evidence shows that Andrews's *Monell* claims could not withstand summary judgment. Municipalities are only liable under § 1983 in limited circumstances. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 685 (1978). Section 1983 does not provide *respondeat superior* liability for municipalities. *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). A plaintiff invokes a *Monell* claim for an "official policy or custom"—when "the unconstitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).

The causation element of a *Monell* claim is a high hurdle to clear. An "affirmative causal link" must exist between the alleged constitutional violation and the harm suffered. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). The unconstitutional policy or custom must be the "moving force" behind the alleged constitutional deprivation. *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (holding *Monell* liability only exists "where the municipality itself causes the constitutional violation at issue"); *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987) (finding "the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact").

Andrews's *Monell* theory is predicated on the assertion that the NDA acted as an unlawful policy. However, the NDA itself and discovery confirms that BPD did not have any unlawful practice or policy. The NDA on its own is not an unlawful or unconstitutional policy. An agreement between a local law enforcement agency and the FBI, which merely acts by its own terms to ensure national security and to prevent countermeasures from suspected criminals, cannot be said to violate any law. There is no reading or interpretation of the NDA to suggest that it commands any illegal or unlawful practice. Nor does the NDA not state that law enforcement officers should forego obtaining a warrant or lawful court order before using the technology. At most, it states that L3Harris's proprietary information concerning its technology must be kept confidential. Equally important, discovery confirmed that BPD had no policy, practice, or procedure prohibiting its personnel from disclosing to a reviewing judge that a cell site simulator would be used. *See, e.g.*, SA1077-1081, and record citations therein; *see also* Section I.A.

Thus, Andrews did not suffer a constitutional deprivation, but even if he did, he failed to identify a specific BPD policy or custom that was the "moving force" behind the deprivation. Andrews has never addressed this point, and the record is devoid of any evidence to the contrary. This Court should affirm the District Court's grant of summary judgment on Andrews's *Monell* claim.

54

## <u>CONCLUSION</u>

For the reasons set forth above, Appellees, the Baltimore Police Department, Kevin Davis, Michael Spinnato, and John Haley, respectfully request that this Court affirm the District Court's grant of summary judgment.

Dated:  October 27, 2025          Respectfully submitted,

EBONY M. THOMPSON
    City Solicitor

BRENT D. SCHUBERT
    Deputy Chief, Office of Legal Affairs

NATALIE R. AMATO
    Chief Counsel for Consent Decree

MICHAEL P. REDMOND
    Chief Solicitor, Appellate Practice
    Group

*/s/ Natalie R. Amato*
NATALIE R. AMATO
Chief Counsel for Consent Decree
BALTIMORE CITY DEPARTMENT OF LAW
100 N. Holliday Street
Baltimore, Maryland 21202
(443) 799-5767
natalie.amato@baltimorepolice.org

*Counsel for Appellees*

56

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    This document contains <u>12,848</u> words

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point <u>Times New Roman</u>.

    <u>*/s/ Natalie R. Amato*</u>
    NATALIE R. AMATO

    *Counsel for Appellees*